## SAM HUNTER v. STATE.

No. A-955.   Opinion Filed May 7, 1912.

(123 Pac. 564.)

1.   **APPEAL—Harmless Error—Instructions.** When, in the trial of a homicide case, instructions on the law of self-defense are given which are erroneous and prejudicial as abstract propositions of law, a judgment of conviction will not be reversed, when the record clearly discloses that there is no element of self-defense involved.

2.   **HOMICIDE—Trial—Questions for Jury—Self-Defense.** For facts held insufficient to raise the issue of self-defense, see opinion.

(Syllabus by the Court.)

*Appeal from District Court, Seminole County;
Preslie B. Cole, Judge pro tem.*

Sam Hunter was convicted of manslaughter, and appeals. Affirmed.

*W. I. Gilbert, Crump & Bailey* and *Rogers & Harris,* for plaintiff in error.

*Charles West,* Atty. Gen., and *Smith C. Matson,* Asst. Atty. Gen., for the State.

ARMSTRONG, J.   The plaintiff in error, Sam Hunter, was jointly charged with Walter Epps, in the district court of Seminole county, with the murder of James Cravens. He was convicted of manslaughter, and sentenced by the court to serve 10 years in the state penitentiary.

The material testimony on the part of the state, as shown by the record, may be briefly stated as follows: The accused, Hunter, and Epps, the person jointly charged, were brothers-in-law, and lived on the farm of Jim Cravens, the deceased. Some time prior to this homicide, Cravens had been a witness in a homicide case against a relative of the accused, named Johnson. Subse-

quent to the trial of Johnson, some ill feeling grew up between the accused and the deceased, based upon statements alleged to have been made by Cravens about the wife of Epps, a sister of the accused. Three or four days prior to the killing, Epps met the deceased, who, it appears, had been sick for several days, and had some words with him. A day or two before the homicide, the accused was heard to inquire how the deceased stood with the Odd Fellows Lodge, and how much insurance he carried. On the day of the homicide, the accused went down to the field where an employee of Cravens, named Sam Harrison, was at work, and in a conversation with him said, "Sam, Cravens has been talking about your woman," to which Harrison replied: "I guess not. I have known Cravens for years and have worked for him. He is one of the best friends I have, and that certainly cannot be true." Accused replied: "Yes; he cussed your woman, and if a man would cuss my wife or my woman I would kill him." Accused went away, and later appeared at the home of one Stubbs, about a mile from the home of the deceased. About 1 o'clock accused, in company with Epps, appeared at the house of a Mr. Cummins, where they got in a wagon with a person by the name of Owen, who was passing along the road, and went down to the home of the deceased, when they got out and started up to the house. As they started away, Owen admonished them not to go up to the house and have trouble, as there was no need of it. They turned and looked at him, but made no reply. They went on to the house, where they met some of the deceased's employees, and asked if deceased was home. They were told he was not. They inquired where he was, and were advised that he had gone to a neighbor's by the name of Ragan, a mile or two distant. They then asked for a Mr. Huckby, saying that Huckby. had desired to rent some land from them, and were advised that he was also away; whereupon the accused said, "Cravens isn't here," and Epps said: "We can do nothing; Jim Cravens is not here. Let's go home." They left, and instead of going home went down the road by which the deceased would necessarily have to return to his place. Shortly afterwards they were seen

in an abandoned house near where the homicide occurred, and in a short time deceased came along in a wagon with two of his farm hands.

Upon the trial, the plaintiff in error testified in chief as follows:

"A. Epps said: 'Jim, I want to see you; get out.' Q. Then what; did Cravens say anything? A. He said, 'Well?' Q. And jumped off the wagon? A. Yes, sir. Q. Whereabouts were you standing with reference to Cravens and Epps? Which direction was the wagon facing, Sam? A. South. Q. Whereabouts, with reference to the singletrees, was Epps standing? A. Epps was standing about at the end of the singletrees. Q. When Epps said, 'Stop,' to Cravens, 'I want to see you a minute,' did you stop right there, or walk a little farther on? A. I stopped. Q. Whereabouts, at the time Cravens got off the wagon, were you? A. I was right behind the fore wheels. About eight feet. Q. About eight feet from the fore wheels? A. Yes, sir. Q. What was Epps then saying to Cravens? A. He said, 'Jim, you have been talking about my wife.' He says, "Talking of me and my kin.' Q. What did Cravens say? A. Cravens said, 'Well?' Epps said, 'All I want you to do is to acknowledge it, that you did say it or that you did not say it.' Q. Who said that? A. Epps said, 'I just want you to sign a paper saying that you did say it, or that you did not say it.' Q. What did Cravens say then? A. He turned to me, and says, 'Sam, I didn't say it exactly that way.' Q. Says which? A. 'I did not say it exactly that way.' Q. Had you said anything to Cravens in the meantime about what he said about your sister? A. I told him: 'Jim, you know you said it. There is no use to story about it.' Q. Said what? A. That my sister is a damn whore, and could prove it. Q. And then he turned to you and said what? A. 'That he did not say it exactly that way. Q. Then what did he say? A. 'You damn scalawags can't run it over me.' Q. What did he do at the time he said that? A. He threw his hand back this way, and started at me. Q. What did you do? A. Shot him. Q. How many times? A. Twice. Q. Do you know where you hit him? A. No, sir. Q. You shot him, and saw him fall? A. Yes, sir. Q. You say he said, 'You damn scalawags,' and tell the exact language, if that is not the exact language. A. To the best of my knowledge, that is what he said. Q. 'You damn scalawags?' A. Yes, sir; and then, 'You can't run it over me.' Q. Why did you shoot him? A. He started towards me with his hands back in his pocket."

And upon cross-examination as follows:

"Q. And then the boys stopped, didn't they? A. Yes, sir. Q. And then what did Mr. Epps say? A. 'Get out; I want to talk with you.' Q. Is that what he said next, Mr. Hunter? A. Yes, sir. Q. That is the same Jim Cravens who lived back down the road a quarter of a mile, and the same man whose house Epps had been to, was it? A. That was the same man. Q. Did Mr. Cravens get out of the wagon? A. Yes, sir. Q. And when he got out of the wagon, what did Mr. Epps say? A. I don't remember just what he did say. Q. Didn't he say, 'Jim, you God damn forked-lipped son of a gun,' or words in substance to that effect? Didn't you hear something like that immediately after Mr. Cravens got out of the wagon? Didn't you hear that or words in substance like that? A. It seemed like I heard some words something like that. Q. Who said that? A. Epps. Q. Mr. Epps said that? A. Something like that. Q. What did Mr. Cravens say when he said that? A. He said, 'All right.' Q. How long had they talked when Epps told him that he had to sign a paper? A. I don't know. Q. About how long, four or five minutes? A. I couldn't state that. Q. Where was Epps standing with reference to where Cravens was standing? A. He was standing six or eight feet from him. Q. Where were you standing, Mr. Hunter? A. Kind of north of him, north of Epps. Q. North of Epps and west of Cravens? A. Yes, sir. Q. How far west of him were you, Mr. Hunter? A. About six or eight feet. Q. And Epps was eight or ten feet south of him, wasn't he? A. Something like that. Q. And he was talking to Epps, wasn't he? Wasn't he, Mr. Hunter? A. He stopped talking to Epps and went to talking to me. Q. Why did he do that; did you say anything to him? A. I said, 'Jim, just acknowledge the truth.' Q. Now, Sam, that was after he refused to sign a paper? A. I don't remember. Q. As he talked to you and after he stopped talking to Epps, how was he facing—facing you? A. Yes, sir. Q. With his body to you? A. Looking right at me. Q. And was it then you said, 'Jim, you have talked about my sister long enough?' A. I don't remember saying that. Q. Was he looking at you? As you stood looking at him, west of him, that put Epps west of him? A. South of him. Q. And as he talked to you there was when he said, 'You damn scalawags, you can't run it over me?' A. Yes, sir. Q. He was looking at you when he said that? A. Yes, sir. Q. And as he said that he went to his pocket for his knife or his pistol? A. He threw his hand back to his pocket like this (indicating). Q. Get up here and show me how he did that.

This is north; this is south; this is west. Now, say I am in your place and you are Mr. Cravens; just show me how Mr. Cravens did. A. (Indicates.) Q. Once more? A. (Indicates.) Q. And he was in that position when you shot him? A. Yes, sir. Q. He was in front of you? A. Yes, sir. Q. Tell the jury how the bullet hit him here. (Objected to as argumentative. Objection overruled, and exception saved.) Q. Explain to the jury how the bullet hit him in the inside of the arm. A. Yes, sir. Q. You did not have a crooked barrel pistol? (Objected to, and objection sustained.) Q. When you shot the first time, what did he say? A. He said something or other and came towards me. Q. And came towards you? A. Yes, sir. Q. Did he get his knife out or his pistol? A. I never saw either one. Q. And he was coming towards you after you fired the first shot, when you fired the second shot? Is that right? A. He was coming towards me. Q. Coming right towards you? Then you hit him in the ear the second shot? A. I don't know where I hit him. Q. And you never hit him in the right ear as he came towards you? (Objected to and overruled. Exception saved.) A. I don't know. Q. Which hand did he go to his pocket with? A. His right one. Q. And when you shot him the second time, Mr. Hunter, he never uttered another word, did he, after you fired the second shot? A. I never heard him. Q. Did he fall then? A. Yes, sir. Q. How long did you stay there after he fell? A. I don't know. About a second."

Dr. McDaniel testified that he examined the body of the deceased at the place where the homicide occurred. His testimony is as follows:

"Q. Which direction was the head of Cravens lying? A. It was lying south—west of south. Q. Was the body of Jim Cravens on level ground, or ground slightly inclined? A. It was slightly inclined, but not very much. Q. Inclined up towards the head? A. Yes, sir. Q. How far was that body, Doctor, from the regular wagon track of the road? A. I judge about three feet, or something like that; that would be my judgment of the matter. Q. And it was near the corner of the fence at that time? A. It was about six feet, I would judge, from the corner of the fence? Q. You say you examined the body shortly thereafter? A. Yes, sir. Q. Did you find any wound on the arm of Mr. Cravens? A. Yes, sir. Q. Describe that wound to the jury? A. It was the right arm; and the ball struck the middle of the arm, from the elbow to the shoulder, and went straight through, striking the center of the arm, breaking the bone, and the bullet—a

portion of it—passed through the outer skin. Q. Doctor, examine that piece of lead which I hand you. I hand you Exhibit A. I will ask you to state to the jury what this is and where you got it. A. I suppose that is a bullet; that is what I took it for, and I took it from Mr. Cravens' arm. Q. Is that the piece of lead that you took from his arm? A. Yes, sir. Q. What part of the arm did you take it from, Doctor? A. The inside of the arm. (The bullet was passed to the jury to be examined.) Q. While they are examining it, Doctor, was any part of the bullet protruding from the outer part of the arm? A. Yes, sir. Q. What part of it? A. There was a small portion of the lead that forms a sort of a bump there that was protruding. Q. Indicate on my arm, point out, using that as an illustration, the point of egress on Mr. Cravens' arm. Hold your finger there at that point, where all of the jury can see. A. That is as near as I can get at it. Q. Did it pass through the arm? A. Passed directly through. Q. Could you tell from the wound prints the range of the bullet? A. Yes, sir. Q. Where was it? A. It went directly through like that (indicating). Q. Did you find any other wound on his body? A. Yes, sir. Q. What was it? A. It was a wound in the head. Q. Indicate on my head, so the jury can see, where that wound was on Mr. Cravens. A. It struck right there, directly level of the left ear, a little back, that way. That is about the place the bullet went through, practically straight through. Q. What part of the head did that bullet pass through? A. It passed through the brain. Q. What part of the brain? A. The base of the brain. Q. In your professional opinion, would a person receiving that wound die? A. Yes, sir. Q. How long would it take for a person receiving that wound to die? A. It would be very quick. Q. Tell the jury whether or not that wound destroyed consciousness? A. I think so. Q. How long would it take to destroy consciousness? A. It would be at once. Q. You say it would destroy consciousness immediately? A. Yes, sir. Q. Would it destroy motion? A. Yes, sir."

In attempting to explain why he was carrying the pistol with which the homicide was perpetrated, accused testified as follows:

"Q. Well, why did you have that pistol? What was your object in carrying it? A. There had been some threats made. Two of my brothers had been beat up by Huckby; and they said there was another of the outfit that he wanted to get inside of a week. Q. Who is Jim Huckby? A. A fellow that worked for him. Q. The fellow that is in jail here now? A. Yes, sir."

And on cross-examination on the same subject as follows: "Q. You had been carrying it about a month? A. Yes, sir. Q. Carrying it all the time? A. Most of the time. Q. Every day? A. No, sir; not every day. Q. Practically every day, and you were carrying it for what reason did you say? A. Joe Huckby had— Q. You were carrying it because Joe Huckby had whipped two of your brothers, and there was another one of your family he was going to whip? A. Yes, sir. Q. You say that you were carrying this pistol to protect yourself from Huckby, because he had said he had whipped two of your brothers and was going to whip another, Hunter, is that right? Just tell the jury if that was the reason you were carrying this pistol? A. I was carrying the pistol to protect myself. Q. From Huckby? A. Yes, sir."

Witness George W. Sayne testified that he examined the body of the deceased after the homicide, and the bullet passed directly through the arm in as straight a course as it possibly could have ranged, and just under the arm the ball had protruded out a little and made a blue spot on the deceased's body.

On the foregoing state of facts, counsel for the accused have brought many assignments of error, based principally upon the instructions of the court involving the accused's right of self-defense.

The doctrine they contend for as an abstract proposition of law appears to be sound, but has no application to the facts in this case. Under the testimony of the accused himself, the court would have been justified in refusing to give an instruction on the right of self-defense. The accused had armed himself and, with his brother-in-law, gone to the home of the deceased, and followed him around the country, found him, and killed him without a single act of aggression upon his part that could be reasonably designated an act of aggression. The accused never even said himself that he was in danger or believed himself in danger of death or great bodily injury. Counsel won a great victory in the court below in securing the acquittal of Epps and a conviction of manslaughter for the accused, Hunter. There is not an element of self-defense disclosed by the facts in this case. The circumstances of the homicide were detailed by the only other persons present, who were witnesses on behalf of the state; and

they make the case stronger for the state than does the testimony of the accused.

There is no error of law assigned that we can conscientiously say was prejudicial to the substantial rights of the accused. A conviction for murder under this record would have been just, and would have been sustained. We cannot do otherwise than affirm the conviction for manslaughter.

The judgment of the trial court is affirmed.

FURMAN, P. J., and DOYLE, J., concur.