# CALE SMITH v. STATE.

No. A-2709.   Opinion Filed September 29, 1917.

Rehearing Denied February 4, 1918.

(174 Pac. 1107.)

1.   **HOMICIDE—Self-Defense—Threats by Deceased.** Threats and misconduct on the part of the deceased toward the defendant occurring prior to the homicide form of themselves no justification or excuse for the taking of human life.

2.   **SAME.** Where the element of self-defense enters into homicide cases, it is the duty of the trial court to admit evidence of threats and other misconduct on the part of the deceased toward the defendant under proper instructions to the jury covering the law of self-defense. And this would be true if there was any doubt as to who was the aggressor at the time of the killing.

3.   **SAME.** The plea of justifiable homicide in self-defense protects only those who are without fault. Where under the undisputed facts it clearly appears that the defendant was the aggressor and by his own wrongful conduct and unlawful acts occasioned the homicide, it is not error for the trial court to refuse to admit evidence of previous threats by the deceased against the defendant.

4.   **SAME.** Evidence in this case examined, and **held:** If it be admitted that the defendant was without fault in bringing on the killing, still under his own statement of facts surrounding the killing there was no overt act or hostile demonstration on the part of the deceased such as to justify the admission of evidence showing previous threats and misconduct on the part of the deceased against the defendant.

5.   **JURY—Challenge to Juror for Cause—Review.** The trial court's refusal to sustain a challenge to a juror for cause will not be disturbed by the appellate court, where it appears from the examination of such juror that he had not talked with any one who purported, of his own knowledge, to know the facts of the case, but solely from hearsay and newspaper reports had formed an opinion which he was positive he could disregard, and also unequivocally swore that notwithstanding such opinion he would and could render an impartial verdict upon the law and the evidence.

6.   **APPEAL AND ERROR—Refusal of Requested Instructions— Harmless Error.** Where the instructions given by the court are correct and are as favorable to the defendant as the evidence

would warrant, the refusal to give other instructions requested
by the defendant on the same subject is not such prejudicial error
as would authorize the reversal of a judgment of conviction.

· *Appeal from District Court, Bryan County;*
*Jesse M. Hatchett, Judge.*

Cale Smith was convicted of murder, and he appeals.
Affirmed.

Cale Smith was convicted in the district court of
Bryan county for the crime of murder, and his punish-
ment assessed at imprisonment in the state penitentiary
for life. He was convicted of killing one Newt Carriker
near the town of Bokchito. The killing occurred on the
premises of the defendant and his widowed sister, Mrs.
Addie Moffett, who had been living together in a two-
room house near the rear of which was a smokehouse
which had been used by the defendant as a kitchen. It
appears that Mrs. Moffett had been using the rear or west
room of the two-room house as a kitchen. The smoke-
house which was used by the defendant was about on a
line with the west end of the two-room house and a few
feet south therefrom. The deceased, Carriker, had for
some time previous to the killing been courting Mrs. Mof-
fett. The defendant did not desire that he pay his atten-
tions to his sister, and had previous to the killing ordered
him not to come upon those premises. Mrs. Moffett, how-
ever, was favorable to the attention being shown her by
the deceased and welcomed his presence there. This killing
occurred some time between 8 and 9 o'clock in the morn-
ing on or about the 25th day of August, 1915. About that
time the deceased appeared at Mrs. Moffett's residence,
and as to what occurred after his appearance there we
prefer to quote fully from the testimony of those who were
present, because certain legal questions are involved which

necessarily depend upon the proof of what occurred be-' tween the deceased and the defendant at the time of this homicide.

Mrs. Addie Moffett testified as follows:

"Q. What day of the week did this trouble take place? A. Wednesday morning. Q. What day of the month, do you remember? A. The 25th. Q. Of August? A. Yes. Q. This year? A. Yes, sir. Q. About what time of day? A. About 8 o'clock; something near 8 o'clock in the morning. Q. Who stayed there at your house that night? A. My litle girl and I, Eunice, and Brother Cale and his family, and Marvin Carriker. Q. Who is Marvin Carriker? A. He's Carriker's son. Q. What time did you first see Newt that morning? A. Well, it was something like, oh, it wasn't over ten minutes before he was shot, anyway. Q. Where were you when you first saw him? A. I was standing in the kitchen. Q. Where was he when you first saw him? A. He was coming out there at the barn gate, at the gate that goes out to the barn there. Q. Which way is the barn from the house? A. West. Q. Where did he go? A. He come on—he come on through the back yard and went on around to the front of the house; he cleaned his feet off and came on up the porch and came on into the house. Q. Did he speak to you? A. Yes, sir. Q. Where was he when he first spoke to you? A. He was right on the inside of the screen at the door. Q. What did he say? A. He said, 'Good morning; just in time for breakfast.' Q. What did you say to him if anything? A. I says, 'No, Mr. Carriker; we have done eat breakfast, and I have done washed my dishes, and I and Marvin has milked the cows, and I have done the churning.' Q. What did he say then? A. He says, 'Addie, I want a drink of water.' Q. What did you say to him? A. I told him to come and help himself; the pail was hanging there. Q. What did he do? A. He came right on in and picked up the dipper and went to drinking. Q. What were you doing at that time, Mrs. Moffett? A. I was standing at the stove

stirring some jell. Q. Where was your stove, what part of the kitchen? A. It was in the north end of the kitchen. Q. Where with reference to the west wall? A. Right opposite the stove. Q. Was the stove anywhere near the west wall or east wall of the kitchen? A. It was something like about middle ways of the room; little bit to the west. Q. How far were you standing from the west door of the kitchen? A. Something like about two steps I reckon as near as I can tell. Q. Where was the water bucket? A. Water bucket was hanging up just to the right of the kitchen door. Q. And which way from the kitchen door? A. On the opposite—on the north. Q. North side? A. Yes, sir. Q. And about how far from the door? A. Oh, it was —I don't know how far it was, but just a little piece; just hanging on the opposite side of the door on the side almost even with— Q. Inside the kitchen? A. Yes, sir; right inside the kitchen. Q. Now, when you told Newt to help himself what did he do? A. He picked up the dipper to get him a drink. Q. Where was he standing? A. He was standing right to the left of the bucket. Q. Which way is that, east or south? A. South; on the south side; just reached up and picked up the dipper. Q. Do you know whether he ever got a drink or not? A. Yes, sir. Q. Do you know whether he ever got through drinking or not? A. No, sir, I don't; but I seen him pick the dipper up and turn it up to his head, but I don't know whether he got through drinking or not; couldn't say. Q. About the time he did that did you hear anything? A. Yes, sir. Q. What did you hear? A. I heard a shot come through the west wall. Q. Where did it come from; where was the gun if you know; which way? A. It was from on that west side of the kitchen. Q. Which way with reference to Cale's cook shack? A. It was from on the left side. Q. Well, I mean where was the sound; which way did the sound come from? A. It come from on that side, from the shack, that side of the house. Q. From about Cale's cook shack? A. Yes, sir; the sound was that way. Q. Had Cale said anything to you up to that time? A. No, sir. Q. Had he said anything to Newt? A. Not within my knowledge; if he

said anything, I never heard it. Q. Had Newt said anything to him? A. 'No, sir. Q. Had there been any words passed between any of you at that time? A. Not only just the few words he spoke to me, 'Good morning,' and 'have a drink'— Q. I mean between Newt and Cale? A. No, sir; if there had I never heard nothing of it, he were right there in the house where I was. Q. What did you all do when you heard the shot? A. I just wheeled around facing south; he wheeled around from the water bucket facing me. Q. Did you say anything to him? A. No, sir; not a word; wasn't a word passed between us. Q. Did he say anything? A. Not a word. Q. Now, when you whirled around facing south did you see anybody else? A. Yes, sir. Q. Who? A. I seen my brother at the window. Q. This defendant, Cale? A. Yes, sir. Q. What was he doing when you saw him? A. He had his gun up, looked like, to shoot, as near as I could see. Q. Where was he from the south window? A. He was standing a little to the east side of the window. Just—wasn't right in front of the window but just a little to the east side. Q. South of the house? A. Yes, sir. Q. Now, did he have the gun up when you first looked around? A. Yes, sir. Q. Did he say anything? A. Yes, sir. Q. What did he say? A. He hollered to Mr. Carriker. He didn't call anybody's name, but says, 'God damn you, get out of there; I will kill you.' Q. Had Carriker said anything to him up to that time? A. No, sir. Q. Had you said anything to him? A. Not a word. Q. What did Carriker do now, if anything, when Cale said that? A. Not a thing. Q. What did Cale do? A. Cale shot him. Q. How long was it after you turned around and saw him and he told Carriker to get out of there before he fired the second shot? A. That's more than I can tell you; I stood there and never moved, and I' hollered, 'Go,' and the shot came; that's all I can tell you. Q. All took place right together? A. I never moved from where I was standing? Q. Did you have time to move? A. If I could it wasn't in my knowledge to move. Q. How long after the first shot was it before you heard the second shot; was it a long time or short time? A. Oh, it was—

I don't know how long, but it was time that he could have run out of the house if we had knew what it meant, but I didn't know what it meant and didn't tell him, for I didn't know what it meant; I thought it was an accident shot or something like that. (Defendant objects.) The Court: Never mind. Q. When Cale fired the second shot what did Newt do? A. He run. Q. What direction? A. Run to the east front door. Q. Where did he go to? A. Went to the front screen. Q. What did he do when he went to the front screen? A. He pushed the screen open and fell to his knees. Q. Where did he fall? A. Fell right on the outside on the porch, and then fell over. Q. What did you do? A. I run to him. Q. What did you do when you got to him? A. I got my arm under his head and raised him up and called for some water. Tried to raise him up, and just raised his head up on my arm. Q. Did he say anything to you? A. No, sir; he just looked me up in the face and worked his lips, but couldn't speak a word. Never did speak a word. Q. How long did he live after you got there? A. I couldn't say for sure, but I reckon something like about five minutes. Q. Did you say anything to Cale after he fired the second shot? A. Yes, sir. Q. What? A. I says, 'Brother, you have killed him.' Q. Where was he? A. Brother? Q. Yes. A. He was still at the window. Q. What did he say? A. He says, 'I don't give a damn;' says, 'God damn you, you are the cause of it.' Q. Was that all that was said between you and Cale? A. Yes, sir. Q. What did he do then? A. I don't know what he done; I didn't see him no more right then; I run to the porch you know, when I seen him fall; I hadn't even moved when he said what he did. Q. How was Newt dressed? A. He had on striped overalls and white hat and white shirt. Q. Did he have on a coat or jumper? A. No, sir. Q. Did you see him make any kind of a move or demonstration of any kind toward Cale? A. No, sir."

Eunice Moffett, daughter of Mrs. Addie Moffett, testified as follows:

"Q. Where did you first see Mr. Carriker that morning? A. Down below the back gate. Q. Which way was he going? A. He was coming towards the house. Q. Where was your Uncle Cale at that time, if you know? A. I don't know; I think he was in that little side room. Q. The cook shack? A. Yes, sir, that's where he was the last time I saw him. Q. Where did Mr. Carriker go when he came up to the house? A. He came up and came in the back gate and came around the front door; came around to the front porch. Q. Where did he go from there? A. He came in the house. Q. Did he stop in the big room? A. No, sir; he just kept walking pretty slow I think, and walked on into the kitchen. Q. Where were you when he came in the front room? A. I was in the front room. Q. Where was Marvin Carriker? A. He was in there, too. Q. Did Mr. Carriker say anything when he got in the house? A. Well, he said, 'Good morning,' and said he was just in time for breakfast, and said he wanted a drink. Q. Did your mother say anything when he said he was just in time for breakfast? A. Yes, sir. Q. What did she say? A. Says, 'No, Mr. Carriker; I have done milked and got the churning done,' or something like that. Q. Where was your mother? A. She was in the kitchen. Q. Then what did Mr. Carriker do after that?. A. He said he wanted a drink. Q. What did your mother tell him? A. Told him he was welcome. Q. What did he do then? A. No, she said 'help yourself,' and he walked on in and got him a drink. Q. Where did he go to get him a drink? A. He went into the kitchen. Q. To what particular place in the kitchen? A. Back door. Q. Well, did he go to the water bucket there? A. Yes, sir. Q. What did he do when he got to the water bucket? A. He taken his hand and got the dipper out and put some water in it to take a drink and taken a drink, was drinking— Q. Where was your mother during that time? A. She was standing at the stove stirring some jell. Q. Did you hear anything about the time Mr. Carriker got over to the water bucket? A. I heard something after he done got up to the water bucket and picked up the dipper. Q. What did you hear? A. I heard

a shot. Q. What was Carriker doing when you heard the first shot? A. He was getting a drink. Q. Was he just in the act of drinking or had he finished? A. He hadn't finished; he was drinking. Q. Where did that shot come from if you know; where did it sound like it came from? A. It sounded like it came from outside of the house; outside about the smokehouse. Q. Had Mr. Carriker said anything to anybody outside before that shot was fired? A. If he had, I didn't hear it. Q. Had anybody said anything to him from the outside? A. If they did I never heard it. Q. What did you all do when you heard that first shot? A. I turned and run, and Marvin did too. Q. Do you know what Mr. Carriker did before you turned to run? A. No, sir. Q. You don't know what he was doing when you were running off? A. I know what he was doing just as the shot fired; he was getting a drink, but after the first shot I turned and run, and I don't know what he done then. Q. Which way did you run? A. I run out the front door east. Q. Which way did Marvin run? A. Out the front door east, the same way. Q. Which one of you was ahead? A. I don't remember. Q. Did you hear any more shots? A. Yes, sir. I heard one, but I don't know where I was when I heard it, I was scared so bad. Q. About where were you? A. I was between the middle door where I was first standing and the front gate. Q. You were between the middle door where you were first standing and the front gate; had you stopped running? A. No, sir; I was still running. Q. Do you know where Marvin was? A. He was right along there somewhere close to me. Q. When did you next see Mr. Carriker, if you did see him? A. He was nearly at the front door the next time I saw him. Q. What was he doing? A. He was just walking. Q. Where did he go to and what did he do? A. When he got to the screen, why he just throwed his hands out that way and fell. Q. Did you see your mother? A. I don't remember seeing Mamma until—the first time I remember seeing her—I never saw her in the room; the first time I remember seeing Mamma after that was out in the porch.

9-14

Q. Did you see your Uncle Cale any more then? A. Yes, sir. Q. Where was he? A. He was there close to the smokehouse with his gun in his hand. Q. What kind of a gun was it? A. It wasn't no shotgun or it wasn't a pistol; I don't know what it was; I guess it was a Winchester. Q. Do you know your Uncle Cale's gun? A. No, sir; I don't; couldn't swear to it at all. Q. Did you hear either your mother or Cale say anything about that time? A. After both shots were fired? Q. Yes. A. No, sir. Q. You don't remember anything that was said either by your mother or Cale after the second shot was fired; did you hear your mother say anything to Cale at all? A. No, sir. Q. About what he had done? A. No, sir. Q. Did you hear her at any time say anything to him? A. No, sir. About what he had done? Q. Yes. A. No, sir. Q. Did you hear Cale say anything to her about it? A. No, sir. Q. Or to anybody? A. About what he had done to him. Q. Yes. A. No, sir."

Marvin Carriker, 15 year old son of the deceased, testified in effect the same as Eunice Moffett.

Cale Smith, the defendant, testified in part as follows:

"Q. Now, on the Wednesday morning that you saw him there at your house when this difficulty happened, when did you first see him? A. I first seen him when I stepped to the door; seen him at the water bucket. Q. You stepped to what door? A. Little door; I was sitting in the little cook shack there; I was sitting in there nussing my little boy. Q. Who, if any one, gave you the information he was there? A. My little boy came running to me and says, 'Dad, Newt has come.' I set the little boy down and stepped to the door, and as I stepped to the door he walked up to the water bucket about that time. Q. Standing in the door of the cook shack, as you call it, could you see in the back door of the kitchen? A. Yes, sir. Q. When you looked from the door of your little cook shack, as you call it, toward the back door of the kitchen, what did you see, if anything? A. Well, I seen Mr. Carriker there; he was

getting a drink.  Q. What, if anything, did you say at that time?  A. Well, I says, 'Get out from my place and leave.' Q. Did you say that loud enough for him to hear it?  A. Yes, sir.  Q. What, if anything, did he say?  A. I didn't understand him to say anything.  Q. What did you do then?  A. When he did that I reached back and got my gun, in the shack, and got the gun that was laying up just over the door, up on some poles—  Q. I hand you this gun and ask you to look at it and state whether or not that's the gun you got?  A. Yes, sir; that's it.  Q. Is it in the same condition now that it was when you had it at that time, relative to the sights?  A. Yes, sir.  Q. That's the gun you shot later?  A. Yes, sir.  Mr. Utterback: We offer this gun.  (There being no objection, the gun is admitted.)  Q. That's a Winchester, isn't it?  A. Yes, sir. Q. What size is it, Cale?  A. Thirty-eight.  Q. Winchester .38 with a lever action?  A. Yes, sir.  Q. Now, when you reached back and got that gun, what did you do next?  A. As I stepped out with it I hollered again, 'Leave there and get off the place,' and no one never replied or nothing— Q. When you said that where were you standing relative to the door of your shack?  A. I was standing right outside the door right in front.  Q. Where, if you know, was Newt at that time?  A. He was right by the door; I could see part of him right by the south kitchen door.  Q. South or west?  A. West kitchen door.  Q. Is there any door in the south of the house at all?  A. No, sir; just a window. Q. When you saw him there and made that statement, what did you do, if anything?  A. I backed off southeast from the door; kinda backed out that way southeast, expecting him to come out the west door of the kitchen.  Q. Prior to the time you left your door did you do anything when you made the statement about him leaving and you could see him there; after you got this gun, what did you do, if anything?  A. The first time?  Q. You stated to the jury after you made the statement to him to 'leave this place' you could see him there and didn't hear anything said; you reached back and got this gun.  Now, after you

got that gun, you told what you said as you stepped out of that door? A. I walked out in front of the door, and I said to him to leave again, and he didn't do it. Q. Then, what did you do, if anything? A. I shot up under the eave of the house right close to the edge of the boards, ranging up this way (indicating). Q. Tell the jury whether or not you at that time saw where Newt was. A. Yes, sir; I could see his arm back of the door. Q. Tell the jury whether or not you shot in his direction. A. No, sir. Q. Or tried to shoot toward him at all? A. No, sir; the door came this way, and I shot up this way. Q. Immediately after you fired the shot, what, if you know, was said in the house? A. Well, it wasn't long, until I heard my sister say, 'Leave, Newt; he will kill you.' Q. Before you heard her say that did you hear anybody screaming or running or anything like that? A. Yes, sir; the little kids, the first shot they went to screaming and running. Q. Could you tell from where you were where the children were in the house; could you tell what part of the house they were in? A. No, the noise sounded going through the house; you could hear the screaming. Q. When your sister said, 'Leave, Newt; he will kill you,' what did you do, immediately after firing the shot? A. I stepped back southeast from where I was standing, just backed off, expecting him to come out at the west door, but he didn't, and when I got there, when she made this remark, I looked through the screen window. Q. Tell the jury when she made that remark relative to when you were south of the window. A. Yes; I was south of the window, and she made that remark. Q. What else, if anything, did you hear said in there at that time? A. Well, he says, 'No;' says, 'I won't leave; I will kill him.' Q. Who said that? A. Newt Carriker. Q. Where were you standing at that time? A. I was standing back southeast from the door of the little cook shack. Q. Where were you relative to the window in the south end of the kitchen? A. I was right south of it, I suppose. Q. What did you do when you heard him say that? A. Well, I heard him say that, and I looked through

and saw him standing right by the middle door, through that window. Q. You looked through the south window of the kitchen? A. Yes, sir; I looked through the south window of the kitchen and seen him standing there. Q. What was he doing. A. Standing there looking kinda across at me when I noticed him looking right at me. Q. How long was that after he made that statement, 'I will not leave; I will kill him?' A. When he made the statement that 'I will kill him,' why he was standing with his right hand in his pocket. Q. Stand up and show the jury as near as you can how he was standing. A. Right this way (the witness indicates), standing looking right at me this way. Q. When he made that statement, what did you do? A. When he made that statement and I seen him through the window, I raised and shot. Q. Take any aim? A. No, sir; I just raised and shot. Q. What did you do that for? A. I done it because I was afraid he was going to kill me. Q. What did you do immediately after you fired? A. I walked back to the door to the cook shack. Q. What did he do? A. He run. Q. Which way? A. East. Q. Would that take him out from the front of the house? A. Yes, sir. Q. What did you do when you went back to the cook shack? A. I laid my gun up. Q. Then what did you do? A. I went right straight on out; the fence was tore down, and I went straight out and into the road just at the corner of the fence and right on up right on to town. Q. That the nearest traveled road to town? A. It's a road, but not a public road; people travels it that goes through there and goes straight on to town. Q. That's not a section line road? A. No, sir; it's a field road; it's on a line, but not a section line; goes right straight to the line that goes into town. Q. Did you surrender when you went into town? A. Yes, sir. Q. Cale, tell the jury why you thought he was going to kill you and how you thought he was going to kill you when you heard him make that statement and saw him in that position? A. I thought he was going to jerk a gun

out of his pocket and going to shoot me, because he had made threats, and I was expecting him to do it."

On cross-examination the defendant testified in part as follows:

"Q. Then the first that you knew of the presence of Mr. Carriker in your sister's home was when your little boy came running in and says, 'Papa, Mr. Carriker has come,' or words in substance that? A. Yes, sir; that's the first I knew he was there. Q. You didn't see him at all until you saw him, or rather saw his hand, when he was at the water bucket, toward the back of the house, getting a drink of water? A. As I raised up there I seen him walk to the water bucket; walked up, coming through from the east door; walked right through into the kitchen. Q. Did you see him reach and get the dipper and take a drink? A. Yes, sir. Q. And that's all he was doing when you looked and saw him? A. Yes, sir. Q. Then you claim that in a loud tone of voice you said, 'Go way from here; leave this place,' or in substance that? A. Yes, sir; I told him to leave. Q. But you didn't see anything to indicate that he heard you, and he made no reply, but still kept drinking his water— A. I don't know whether he kept drinking his water— Q. He still stood at that place? A. Stood right there. Q. Never moved? A. He moved back a little; you could just see a part of his arm. Q. Could you see the dipper in his hand? A. Did at first. Do you know whether he still had the dipper in his hand and was drinking when you made that statement to him, or do you not? A. I don't know; he turned; could see this shoulder like he was facing that way (indicating); when he first reached up with his right hand, I could see him then. Q. I understand that; I am asking now about the time you made the statement to him 'to get off the place'; all you could see was his arm and you didn't know what he was doing? A. No, sir. Q. You don't know that he heard you? A. No, sir. Q. And he made no reply to you? A. No, sir. Q. Then you stepped back and got your gun at that time, and

all you could see was his arm there in the door? A. Yes, sir. Q. And you brought that gun out? A. Yes, sir. Q. And you said in a loud tone of voice, as you claim again, 'Get off the place?' A. I told him when I stepped out to get off the place. Q. What language did you use? A. Well, just ordinary tolerable loud language. Q. You didn't see anything to indicate that he heard you then? A. No. Q. He didn't say anything? A. Not right then he didn't say anything I heard. Q. Nobody else said anything? A. Not that I heard. Q. You were the only one that said or did anything? A. Yes, sir. Q. Then you raised your gun and fired into that house? A. Yes, sir. Q. Into the room where he was standing? A. Yes, sir; in the corner of the room; he was at the door. In the corner, just a little north of the corner, I shot up into the house. Q. Then as soon as you did that you walked around south of the house where you could see into the window? A. I backed off southeast. Q. Where you could see into that window? A. Southeast from the corner; I was looking at the west door. Q. I understand, but you backed off in a southeasterly direction where you could see in through that window into that room later? A. I wasn't looking through the window at that time. Q. You wasn't looking through the window at that time? A. I was backing off looking at the west door. Q. My question was if you didn't back off where you could see through the window into the room where Carriker was? A. Well, I could see into the window if I looked that way. Q. You want to tell the jury you expected this man Carriker, after you had just fired a shot out at that back door through, in the vicinity of that back door, you want to tell the jury you expected that man to step out there in your face where you had a Winchester? Mr. Utterback: Object to counsel arguing with the witness and asking if he makes these statements to the jury. All these statements are to the jury. The Court: I think you ought to tone down the tone of the examination some. Q. Did you say you expected him to step out of the door was why you backed away? A. Yes, sir; I expected him coming out the west door, and I backed out southeast from the corner

from that door. Q. You say when you heard your sister say to Carriker, 'You had better run; he will kill you,' you looked in at that window; is that right? A. Yes, sir. Q. And you saw Mr. Carriker standing there facing the east with his hand in his pocket? A. He was standing there, his body facing the east, and his head was looking right back through that window. Q. And his hand was in his pocket? A. Yes, sir. Q. You didn't see him put his hand in his pocket? A. No, sir. Q. His hand was already in his pocket? A. When I first seen him. Q. And you fired before he made any move? A. If anything he moved just a little. Q. His head? A. Yes. Q. Never moved his body or hand? A. I don't know; couldn't say. Q. You didn't see him if he did? A. No; I didn't see; couldn't tell whether he moved his hand or body or not. Q. He was standing in the door there within three feet of the water bucket at that time, was he not? A. No, sir; he was further to the east next to the middle door; right close to the middle door. Q. How far from the water bucket? A. Oh, it was about something like five feet. Q. Then he was still standing within five feet of the water bucket, where he was taking a drink, when you fired the first shot? A. No; when I fired the first shot he was partly in the door at the water bucket. Q. Then he had moved not to exceed five feet toward the east from the time you fired the first shot until you fired the second shot? A. Yes; after the first shot he moved back east about five feet or six. Q. You didn't see him move? A. No, sir; I couldn't. Q. In other words, when you first saw him through the window he was standing still with his body facing toward the east, but his head slightly turned— A. Turned, looking right straight at me. Q. And his hand in his pocket, but making no motion? A. With his hand in his pocket like I said, looking right straight at me. Q. And making no motion? A. Well, I don't know whether he was making any motions or not. Q. You didn't see him make any? A. I didn't see him make any that I know of."

Mrs. Grace Smith, wife of the defendant, testified in part as follows concerning what occurred at the time of the killing:

"Q. Mrs. Smith, were you at home the morning of this difficulty? A. Yes, sir. Q. Where were you when you first learned that Newt was there? A. We were in the little cookroom where we cook. Q. What did your husband do at that time? A. He raised up and walked toward the kitchen door and looked inside the door tolerable close; didn't go plumb to the door; just tolerable close to the door and looked in. Q. What, if anything, did he say? A. He told Mr. Carriker to get out of his house. Q. What, if anything, else was said and by whom? A. I never heard anything else that was said except that. Q. What did your husband do? A. He come back to the little room and took the gun. Q. Did you see him when he got the gun? A. Yes, sir. Q. What did he do then? A. He stepped back outside the cookroom. Q. Which way did he go from the door, if he went any way, or did he stand in front of the door when he stepped out with the gun? A. He stood in front of the door just a little ways. Q. What, if anything, did he say? A. He hollered again just as loud as he could and told him to get out of his house. Q. What did he do then? A. After the second time he hollered he shot; up through the upper end of the house. Q. Where were you at that time? A. Inside the cookroom. Q. What did you then hear, if anything? A. Never heard anything. Q. I mean relative to anybody screaming or any fuss in the house. A. I heard Mrs. Moffett screaming, I think is all. Q. Did you then hear your husband say anything more? A. Yes, sir; I heard him holler again. Q. What did he say? A. Told him to get out of his house. Q. Did you ever, after that time, hear what was said in the house, or anything that was said in the house? A. No, sir. Q. Which way, if any, did your husband go at that time? A. He stepped back where he could see both the front part of the house and the back part of the house. Q. Which way did he step back? A. He stepped back towards the fence;

stepped backwards. Q. You mean in a southeast direction from the front of the cook shack? A. Yes, sir. Q. How was he carrying his gun? A. Had it down at his side. Q. What was the next thing you saw that your husband did? A. He first looked in the window where he could see in the window and raised the gun to his shoulder and fired. Q. Did you hear anything that was said in the house before your husband fired? A. No, sir. Q. What were you doing? A. I was standing just in front of the cookhouse. Q. Any of your children in your arms or with you? A. Yes, sir; the baby was crying in my arms. Q. Do you know what if anything was said by anybody out there? A. No, sir. Q. Could you hear with the child crying? A. No; I couldn't have heard, I don't suppose, if they said anything. Q. What did your husband do after firing the shot? A. Well, he stepped first after he fired the shot; he stepped to where he could see the front of the house and then stepped back to where I was at. Q. Do you know he stepped to where he could see the front of the house, or do you mean he stepped a few steps further? A. He stepped a few steps further; I don't know whether he could have seen the front of the house or not; I just supposed he stepped there to see if Mr. Carriker went on. Q. Where did he go after he fired the second shot, and you say he made these few steps; where did he go, if anywhere, if you know? A. I don't know as he went anywhere. Q. Well, did he come back to the cook shack or go away? A. He came back where I was. Q. What did he do? A. He put his gun on the inside of the room and talked with me awhile. Q. Then what did he do? A. He went on to Bokchito. Q. Did you see him any more that day? A. No, sir. Q. Did you hear any statement made by him to Mrs. Moffett immediately after that second shot was fired or before he left—Mrs. Addie Moffett? A. I don't remember; he might have made some, but I don't remember whether he did or not. Q. You were very much excited? A. Yes, sir."

On cross-examination the witness testified as follows:

"Q. What was Cale doing at that time? A. He was just sitting in the cookroom in the chair; it was misting rain, and he had been waiting for me to get ready to do— Q. Never mind; he was sitting in the chair; now, what did you or Cale say when Dee told you Mr. Carriker was there? A. Cale said he wouldn't stay there long; he had to leave. Q. Was Cale still sitting at that time? A. No, sir; he had raised up. Q. What did he do when he raised up? A. He stood there and talked to me a few minutes; I begged him not to say anything to Carriker, and then he stepped outside. Q. What did you say to him when you begged him not to say anything to Carriker? A. I says, 'Cale, I wouldn't say anything to him; I would let him come on; don't pay any attention to him.' Q. What did Cale say? A. Said he wouldn't do it; wouldn't be run over in any such way; that he thought he was a coward, and he wanted to show him he wasn't. Q. He thought he was a coward and he wanted to show him he wasn't? A. Yes, sir. Q. How long did you beg him in that way? A. I spoke to him once or twice, I don't remember which. Q. What did he say to you about not interfering with him? A. He never said anything that way; said for me to let him alone, he was going to make him leave. Q. I will ask you if he didn't say, 'You know better than to ask me not to?' A. I don't know as he did; I don't remember. Q. Well, didn't he make that statement to you in substance? A. He told me not to say anything to him; he intended to make him leave; I don't remember exactly what he said. Q. Didn't Cale then say he wasn't going to stand for it? A. I don't remember his exact words. Q. Now, had he got his gun at that time? A. No, sir. Q. Where was his gun? A. It was up above some piece that was across the top of the smokehouse. Q. Did you take hold of Cale? A. No, sir. Q. What did he do just after you all talked about it, and you begged him not to go out there? A. He stepped outside the smokehouse and looked in the kitchen door of the other house. Q. Then what did he do? A. He come back and got his gun. Q. Did he say anything while he was on the outside? A. He hollered and told Mr. Carriker to get

out of his house and leave. Q. What did he say to him. A. Says, 'You leave my house and stay out,' or something like that; I don't remember exactly. Q. I will ask you if he didn't use a curse word? A. I don't remember whether he did or not. Q. Then he came back into the cook shack? A. Yes, sir. Q. And got his gun and stepped out the second time? A. Yes, sir. Q. Didn't he have his gun when he stepped out the first time? A. No, sir. Q. You are positive about that? A. Yes, sir. Q. Now, what did he say to Carriker when he stepped out the second time? A. Just hollered again and told him to leave; to get out of his house and leave. Q. What did he say he would do if he didn't leave? A. Didn't say. Q. Did he use a curse word at that time? A. No, sir; if he did I don't remember. Q. How long after he stepped out the second time before the first shot was fired? A. Quite a few minutes, I don't know; he stood there after he hollered the first time. Q. Stood there some minutes? A. Yes, sir. Q. Where did he shoot from; where was he standing? A. Standing somewhere in front of the smokehouse; I don't know exactly where. Q. Did you see him? A. Yes, sir. Q. Standing just in front of the door wasn't he; not over a foot or two? A. I don't know exactly how far. Q. Had you up to that time heard anybody in the house say anything? A. No, sir; not that I know of. Q. Do you know what they were doing in the house, or who were in there? A. No, sir. Q. Then after he fired the second shot what did Cale do? A. He stepped backwards towards the fence, where the fence should have been, between the yard and the cane patch. Q. That was back south? A. Yes, sir; I suppose so; southeast. Q. Did he step backwards or kind of sideways? A. Stepped backwards; he was watching the back door. Q. How far south did he go? A. Went several steps. Q. Then what did he do after he got out there? A. He hollered again for him to leave. Q. What did he say that time? A. I don't remember exactly what he said; I just remember he hollered and told him to leave. Q. That was the third time? A. I suppose so; I don't know. Q. Well, after he hollered, did you hear anybody say anything in the house? A. No, sir.

Q. Then what did Cale do after that? A. After that I suppose he shot; raised his gun and shot."

*Utterback & MacDonald,* for plaintiff in error.

*S. P. Freeling,* Atty. Gen., *R. McMillan,* Asst. Atty. Gen., *Hayes & McIntosh,* and *McPherren & Cochran,* for the State.

MATSON, J. (after stating the facts as above). Among other things, it is contended that the trial court erred in excluding certain relevant and competent evidence offered by the defendant to his prejudice.

The evidence referred to, according to the offers of proof thereof, related entirely to certain alleged threats made by the deceased against the defendant and other alleged misconduct on the part of deceased against the defendant, which, it is claimed, was competent to go to the jury, because at the time of the homicide the defendant claims that he was in imminent danger of death or great bodily harm at the hands of deceased, and evidence of threats either communicated or uncommunicated and other misconduct on the part of deceased towards the defendant was competent in order to throw light upon the question of who was the aggressor, and to explain the deceased's state of mind toward the defendant, and also to explain defendant's viewpoint at the time of the killing.

If the element of self-defense entered into the homicide, there could be no doubt but that the position taken by the defendant is correct; and if there were a question of doubt as to who was the aggressor in the fatal encounter or whether the defendant acted in self-defense, then it would be the duty of the trial court to submit evidence of threats and other misconduct on the part of the deceased to the jury under proper instructions covering the law of

self-defense. On the other hand, it is equally true that threats and misconduct on the part of the deceased toward the defendant occurring prior to the fatal encounter form of themselves no justification or excuse for the taking of human life.

While it is of the utmost importance that the courts of this state in the trial especially of homicide cases be very careful to safeguard the constitutional and statutory rights of the accused, it is equally important that the taking of human life be not excused or justified except in strict accordance with the established law.

Necessarily, therefore, in the trial of every criminal case the occasion will arise where it will become necessary as a question of law for the trial court to determine whether or not upon the state of the record certain proposed evidence is admissible or inadmissible. If this were not true, there would be no necessity for a presiding officer of the court who is learned in the law. Our trials would retrograde into mere controversies surrounded by confusion and full of hearsay, and other incompetent evidence greatly detrimental to the fundamental rights of the accused.

So that in this instance it was the proper function of the trial court to determine under the state of the record at the time the offer was made whether or not the proposed evidence was competent. And this court is clearly of the opinion that it was just as much the duty of the trial court to exclude incompetent evidence, where there was no question or doubt in his mind as to its incompetency, as it was necessary that he should permit the introduction of all evidence where there was no doubt as to its competency, or even where he had a reasonable doubt as to

whether or not it was competent. In order that justice may be administered, it is important in jury trials that the minds of the jury be directed to those matters which are competent and material, and not be confused by side issues occasioned by the admission of incompetent and irrelevant evidence.

In this instance this court is called upon to decide the question of whether or not there was any element of self-defense in the record in this case at the time the trial court excluded this evidence. If there was an element of self-defense, then the evidence should have been admitted; if not, the trial court is to be commended in confining the issues of fact to the law of the case.

It is our firm conviction that the trial court did not commit error in excluding this proffered testimony: First, because there is no doubt, under all the evidence introduced, including the defendant's own testimony, that at the time of the killing he was the aggressor, and that his own unlawful conduct placed him beyond the pale wherein he could claim he acted in self-defense; second, if it be admitted that the defendant was without fault in bringing on the killing, still under his own statement of facts surrounding the killing there is no evidence of any overt act on the part of the deceased such as would justify the admission of evidence showing previous threats and misconduct on the part of the deceased against the defendant.

In the case of *Morris v. Territory*, 1 Okla. Cr. 617, 641, 99 Pac. 760, 769, this court said:

"The case of *Mealer v. State*, 32 Tex. Cr. R. 102, 22 S. W. 142, is in point as to this question. The evidence in that case disclosed the fact that at the time the fatal shot was fired the deceased was engaged in a scuffle with and

was being held by a third party. The defendant came up and killed deceased. The defendant sought to justify his action by offering evidence of threats made against him by the deceased. This evidence was excluded by the trial court. Upon appeal the court said: 'There was certainly no error in the refusal of the court to permit appellant to prove threats against himself on the part of the deceased. The defendant was in no possible danger when he shot deceased.'

"In the case at bar the defendant was in no possible danger from P. W. Cassidy when he fired the shot that killed Finis Cassidy. Therefore defendant could not have a reasonable apprehension or fear of death or great bodily harm from P. W. Cassidy on account of anything that he may have said or done."

Again, in the case of *Reed v. State*, 2 Okla. Cr. 51, 103 Pac. 1054, this court held:

"While the necessity of taking human life need not be one arising out of real, actual, or imminent danger, in order to justify the slayer, as he may act upon the belief arising from appearances, which gives him reasonable cause to apprehend danger of death or of great bodily harm, although there may be no actual danger, and his guilt must depend upon the circumstances as they appear to him, but the danger must not be brought on by the wrongful conduct or unlawful acts of the slayer. * * *

"Where it is clearly and unequivocally shown that the defendant was the aggressor, and there is no pretense that the deceased was about to carry the threats into execution, or that the defendant had reasonable grounds to believe, and did believe, that such was the case, evidence of such threats by the deceased, although they were communicated to the defendant, is inadmissible."

In the body of the opinion the court, speaking through Judge Doyle, says:

"The eighth assignment is that: 'The court erred in sustaining the objection of the state to the deposition of Ely Horton.' In this deposition an attempt was made to show by this witness that the deceased had used threatening language toward defendant and his family, about six months prior to the homicide. It will be conceded that threats made by the deceased, when communicated to defendant, are sometimes competent evidence in his behalf, and in some cases they are admissible, although never communicated. *Price v. United States,* 1 Okla. Cr. 291, 97 Pac. 1056. The deposition was offered for the purpose of proving a case of justifiable homicide in self-defense, and its admissibility depends upon the facts and circumstances of the homicide. If A. threaten the life of B., this fact will not of itself justify B. in killing A. There must be some overt act on the part of the person making the threat, from which it appears that there is real or apparent danger of the execution of the threat."

Mr. Wharton, in his work on Criminal Evidence, par. 757, says:

"Can evidence to the effect that the deceased prior to a homicide threatened the defendant's life be received? And, if so, is it a prerequisite to the proof of such threats that they should be shown to have been communicated to to the defendant? Certainly, if such evidence is offered to prove that the defendant has a right to kill the deceased, there being no proof of a hostile demonstration by deceased, then it is irrelevant. If A. threatens B.'s life, and this threat is known to B., B.'s duty is to have A. arrested by due process of law, not to shoot him; the right of self-defense being conditioned on an apparent attack. On the other hand, if the question is as to which party in the encounter is the assailant, then it is admissible to prove by the prior declarations of either that the attack was one he intended to make. Threats to this effect by the defendant are always, as has been seen, ad-

missible; and it is properly held that there is equal reason, supposing a collision between the deceased and the defendant to be first proved, for the admission of threats by the deceased."

And Kerr on Homicide, p. 423, says:

"Where it is clearly and unequivocally shown that the defendant was the aggressor, and there is no pretense that the deceased was about to carry the threats into execution, or that the defendant had reasonable grounds to believe and did believe that such was the case, evidence of such threats by the deceased, although they were communicated to the defendant, is inadmissible. While justice and the law demand that no competent or material evidence favorable to the defendant shall be excluded, under the conceded facts in this case, the court properly sustained the objection to said deposition."

And in *Hunter v. State*, 7 Okla. Cr. 300, 123 Pac. 564, it was held:

"When, in the trial of a homicide case, instructions on the law of self-defense are given which are erroneous and prejudicial as abstract propositions of law, a judgment of conviction will not be reversed when the record clearly discloses that there is no element of self-defense involved."

In *Rollen v. State*, 7 Okla. Cr. 673, 125 Pac. 1087, it was again held, in substance, that any error in an instruction defining the law of self-defense was not prejudicial to the defendant where the evidence did not justify an instruction on self-defense. The court called attention to the facts surrounding the shooting in that case, and held that the evidence of the defendant of what occurred at the time of the shooting did not raise an issue of self-defense.

Prof. Wigmore, in his work on Evidence, in vol. 1, sec. 111, states the rule as follows:

"The evidence of threats is inadmissible where there is clear evidence that the defendant was the aggressor. Most jurisdictions adopt this rule, and none seem to negative it. (b) Furthermore, it is only admissible (as most courts provide) where there is some other evidence of an aggression by the deceased. This is usually expressed by saying that there must have been some 'demonstration of hostility,' or more shortly, some 'overt act,' by the deceased. It is difficult to say whether this limitation originated in the *res gestae* notion *(infra)* or in a rule of criminal law that an overt act is a necessary element of the justification of self-defense, or merely in a general policy of preventing the abuse of this evidence. At any rate, it seems a satisfactory limitation, provided the multiplication of quibbles as to 'overt acts' is avoided by leaving the whole matter in the hands of the trial judge; for it prevents the defendant from trying to use the threats as a mere pretext for justifying the killing of one who was making no actual attempt to injure him."

In the case of *Harrison v. State*, 24 Ala. 67, 60 Am. Dec. 450, the Supreme Court of Alabama, speaking by Chilton, C. J., said:

"The law of self-defense, so far as the proof set out in the record shows the transaction, had nothing whatever to do with the case. Harrison, in the first instance, brought on the difficulty, by a most unneighborly and malicious act, in stopping the ditch, thus injuring himself in order to overflow the growing crop of the deceased. When it was attempted to be opened, he was there, throwing in the dirt, as the wife and children were engaged in throwing it out; he inflicts personal violence upon one of the children with his hoe, and when the child left, he flies to his gun; and without necessity, and in the absence of any attempt or demonstration of an intention to injure him, on the part of the deceased, other than having

his gun upon his shoulder, he deliberately shoots him down while in the act of speaking to his wife. It was (so) calculated to mislead the jury, to charge on the law of self-defense under such circumstances, for they might well have inferred that the court would not give a charge which was abstract, and hence that merely having a gun upon his shoulder, without more, put the life of the prisoner in imminent peril, justifying him in what he did. Such is not the law.

"It was correctly said by Ruffin, C. J., in *State v. Scott,* 4 Ired. (26 N. C.) 409, 42 Am. Dec. 148, that 'the belief that a person designs to kill me will not prevent my killing him from being murder, unless he is making some attempt to execute his design, or at least is in an apparent situation to do so, and thereby induces me reasonably to think that he intends to do it immediately.' The 'situation' spoken of is, not that he has the means at hand for effecting a deadly purpose, but that, by some act or demonstration, he indicates at the time of the killing a present intention to carry out such purpose, thereby inducing a reasonable belief, on the part of the slayer, that it is necessary to deprive him of life to save his own. *Pritchett v. State,* 22 Ala. 39, 58 Am. Dec. 250; Whart. Crim. L. 260."

See, also, *State v. Reed,* 137 Mo. 125, 38 S. W. 574; *State v. Byrd,* 121 N. C. 684, 28 S. E. 353; *State v. Jackson,* 33 La. Ann. 1087; *State v. Labuzan,* 37 La. Ann. 489; *Pritchett v. State,* 22 Ala. 39, 58 Am. Dec. 250; *Myers v. State,* 33 Tex. 525; *Evans v. State,* 44 Miss. 762; *State v. Tolla,* 72 N. J. Law, 515, 62 Atl. 675, 3 L. R. A. (N. S.) 523; *United States v. Leighton,* 3 Dak. 29, 13 N. W. 347; *State v. Wiggins,* 50 La. Ann. 330, 23 South. 334; *Andrews v. State* 134 Ala. 47, 32 South. 666; *Ellis v. State,* 152 Ind. 326, 52 N. E. 84.

It will be noted from the foregoing excerpts of the testimony in this case that as soon as the defendant heard that the deceased was on the premises visiting his (defendant's) widowed sister he ran out into the yard and ordered him to leave. There is no evidence as to whether or not the deceased heard the defendant ordering him from the premises, but it is uncontroverted that if he did hear such order he paid no attention to it, and did nothing that would indicate to the defendant any hostility on the part of the deceased toward the defendant. The undisputed evidence is that at the time he was ordered to leave the premises he was in the kitchen taking a drink of water; that the defendant saw him there, and went and got a Winchester rifle, and while deceased was taking the drink of water fired a load from the rifle into the room where the deceased then was. The defendant claims that he did not fire this shot to injure the deceased, but only for the purpose of frightening him so that he would leave the premises. It is immaterial, so far as the question here involved is concerned, as to whether the defendant intended to kill the deceased at that time, or whether he merely intended to frighten him. His act in procuring a deadly weapon and firing it in the direction of the deceased was unlawful. Under the most favorable view we can take for the defendant the deceased was a trespasser upon his premises, unarmed and making no effort to injure a living soul. He was conducting himself in a perfectly lawful and orderly manner, and the use of such means to eject him from the premises without any hostile demonstration of any kind on the part of the deceased was at that time unnecessary and unlawful. This clearly made the defendant the aggressor, and according to his own statement he continued to be the aggressor

until the fatal shot was fired. This was sufficient to deprive him of his right of self-defense.

But let it be admitted that up to the time of the firing of the fatal shot the defendant was without fault. Where is there in this record any evidence that would justify the court in permitting the jury to receive evidence of previous threats by the deceased against the defendant? Where is the overt act or hostile demonstration which this court, and all courts, hold is necessary before such evidence may be admitted? There is no such overt act or hostile demonstration in evidence. Take the evidence of the defendant himself, both on direct and cross examination, viewing the matter as he viewed it, can it be said that the fatal shot was justifiable?

The defendant said that after he fired the first shot into the house he backed around southeast opposite the window to the kitchen. He said that he expected the deceased after the first shot was fired to come out of the rear or west door of the house. Backing to the southeast, therefore, would have placed the defendant in a position where he would have been to the left and rear of the deceased had he come out of the back door. But the deceased did not leave the house, and the next thing that attracted the attention of the defendant was the remark of the sister, Mrs. Moffett, to the deceased, "You had better leave; he will kill you," and the defendant says that upon hearing said remark he looked through the south window into the kitchen and saw the deceased facing the east or front of the house (apparently going out the front way) with his right hand in the front pocket of his overalls, and facing the window into which the defendant was looking, and he heard the deceased say to Mrs. Mof-

fett that he would not leave; that he was going to kill the defendant; that the defendant immediately again raised his Winchester and fired a bullet into the body of the deceased which caused his death.

The deceased was dressed in a white hat and shirt and a pair of striped overalls. He had on no coat or vest. There was no hostile demonstration or overt act on the part of the deceased toward the defendant at the time this shot was fired. If the statement of defendant be true, the deceased merely threatened his life. Deceased did nothing to indicate a present intention to take life. The killing was the act of a coward, and not that of a person who honestly believed himself in danger of death or great bodily harm. The record clearly discloses, even the conduct of the defendant's four year old son, that it was known in the defendant's household that, should the deceased appear upon those premises, trouble would occur. The wife of the defendant testified that she begged him to leave the gun alone, and not to have trouble with the deceased. Her plea was of no avail. She said herself the defendant was mad. Likewise is the testimony of the defendant's sister, Mrs. Moffett. Clearly, under the state of the evidence in this case at the time of the proffered testimony of threats, there was no error on the part of the trial court in excluding the same.

It is also contended that the court erred in overruling the challenge for cause to certain jurors, among whom was one John Mason, who sat as a juror upon the trial and to whom challenge for cause was urged after all peremptory challenges had been exhausted. The ground of the challenge for cause was for actual bias, which is defined under a second subdivision of section 5858, Rev. Laws 1910, as follows:

"For the existence of a state of mind on the part of the juror, in reference to the case, or to either party, which satisfies the court, in the exercise of a sound discretion, that he cannot try the issue impartially, without prejudice to the substantial rights of the party challenging, and which is known in this chapter as actual bias."

It is contended that the juror had formed or expressed an opinion upon the cause to be submitted such as would disqualify him under the foregoing provision of law.

Section 5861, Id., provides:

"In a challenge for implied bias, one or more of the causes stated in the second preceding section must be alleged. In a challenge for actual bias, the cause stated in the second subdivision of the third preceding section must be alleged; but no person shall be disqualified as a juror by reason of having formed or expressed an opinion upon the matter or cause to be submitted to such jury, founded upon rumor, statements in public journals, or common notoriety, provided it appears to the court, upon his declaration, under oath or otherwise, that he can and will notwithstanding such opinion, act impartially and fairly upon the matters to be submitted to him. The challenge may be oral, but must be entered upon the minutes of the court."

The latter section has been repeatedly construed by this court. That said section is not in violation of the constitutional guaranty of the right of trial by a fair and impartial jury was held in *Turner - v. State*, 4 Okla. Cr. 164, 111 Pac. 988.

In *Gentry v. State*, 11 Okla. Cr. 355, 146 Pac. 719, this court, speaking through Doyle, P. J., said:

"The issue raised upon a challenge for cause to a juror in a criminal case on the ground that he has formed

an opinion founded upon rumor, statements in public journals, or common notoriety, and upon which he has expressed an opinion, is one of mixed law and fact; and the finding of the trial court upon the issue ought not to be set aside by a reviewing court, unless it appears that upon the evidence the trial court ought to have found that the juror had formed such an opinion that he could not in law be deemed impartial. *Ex parte Spies,* 123 U. S. 131, 8 Sup. Ct. 22, 31 L. Ed. 80; *Holt v. U. S.,* 218 U. S. 245, 31 Sup. Ct. 2, 54 L. Ed. 1021, 20 Ann. Cas. 1138."

See, also, *Stone et al. v. State,* 12 Okla. Cr. 313, 155 Pac. 701.

The juror Mason on his *voir dire* examination stated that he had formed an opinion of the guilt or innocence of the defendant based solely on newspaper reports and hearsay. He swore that the opinion would yield readily to the evidence, and that he could, notwithstanding such opinion, act fairly and impartially in the case and be guided by the evidence introduced and the law as given by the court. There was nothing to show ill will or hostility on the part of this juror towards the defendant.

An examination of the record discloses no abuse of discretion on the part of the trial court in overruling the challenge for cause to this juror such as would authorize this court to reverse the judgment.

From what has heretofore been said it necessarily follows that the court's refusal to instruct on the law of self-defense was not error. The court instructed the jury on manslaughter in the first degree, and while it is not contended that the instructions given on this subject were erroneous, it is claimed the court should have given others requested by the defendant which were worded in more specific language. With this contention we cannot

agree. The instructions given fully defined manslaughter in the first degree, and were not misleading or confusing. They were as favorable to the defendant as the evidence would warrant.

The judgment of the district court of Bryan county is affirmed.

DOYLE, P. J., and ARMSTRONG, J., concur.