## A. L. OWEN v. STATE.

No. A-2862.   Opinion Filed March 8, 1917.

(163 Pac. 548.)

1. **CRIMINAL LAW—Capacity to Commit Crime—Insanity—Test.**
The true test of criminal responsibility, where the defense of insanity is interposed, is whether the defendant had sufficient reason to know the nature and quality of his act, and whether he had sufficient reason to know right from wrong.

2. **NEW TRIAL—Bias—Expressed Opinion of Jurors—Affidavit—Knowledge.** When affidavits charging jurors with having expressed opinions as to the guilt of the defendant prior to their being called as jurors are relied upon to annul the verdict and obtain a new trial, it must be clearly shown that neither the defendant nor counsel for the defendant knew the facts averred in such affidavits at the time the jury was impaneled.

3. **APPEAL AND ERROR—Question of Fact—Finding.** As a general rule, the finding of the trial court upon an issue of fact arising upon affidavits and evidence adduced on a motion for a new trial will not be disturbed where the evidence reasonably tends to support such finding.

4. **APPEAL AND ERROR—Modification of Sentence.** Under Procedure Criminal (section 6003, Rev. Laws 1910), this court in the furtherance of justice has the power to modify any judgment appealed from by reducing the sentence.

5. **CONTINUANCE—Affidavit—Absent Witnesses—Admission.** The record shows that on September 4, 1916, the defendant was arraigned, and on September 6th he filed a motion for continuance based on the absence of material witnesses, one of whom was a nonresident of the state. On the same day the motion was overruled by the court, and the defendant was put upon trial. **Held,** that the affidavit for continuance is insufficient, because it fails to show that the defendant could procure the attendance of such nonresident witness, and fails to state that he intends to take the deposition of such nonresident witness. However, technical objections should not ordinarily prevent the granting of a continuance, and in this case the county attorney should have admitted that said witness, if present, would testify as stated in the defendant's affidavit, and that said affidavit might be read and treated as the deposition of the absent witness, and for this reason the judgment and sentence of death is modified to imprisonment for life at hard labor.

*Appeal from District Court, Cherokee County;
John H. Pitchford, Judge.*

A. L. Owen was convicted of murder, his motion for new trial was overruled, and he brings error. Judgment and sentence modified and affirmed.

*Hainer, Burns & Toney, Geo. H. Hughes,* and *Henry D. Green,* for plaintiff in error.

*S. P. Freeling,* Atty. Gen., and *R. McMillan,* Asst. Atty. Gen.; for the State.

DOYLE, P. J. The plaintiff in error, Owen, was, by information duly filed in the district court of Cherokee county on the 23d day of August, 1916, charged with the crime of murder, alleged to have been committed in said county on the 4th day of May, 1916, by shooting one Lizzie Morgan with a pistol. On September 4th following he was arraigned, and on the 6th day of September he was put upon trial, which resulted, on the 8th day of September, in a verdict of guilty of murder and fixing the penalty at death. On September 12th his motion for new trial was overruled and judgment rendered on the verdict, and he was sentenced to suffer death by electrocution on the 27th day of November, 1916, in the manner provided by law. From the judgment and sentence an appeal was taken by filing in this court on October 28, 1916, a petition in error with case-made.

The facts, briefly stated, are as follows:

The plaintiff in error at the date of the homicide was about 50 years of age, and had resided near the old negro seminary, about six miles north of Tahlequah, for seven or eight years. He was a widower, his wife having died about five years before. He had nine children, five sons, aged respectively 28, 13, 11, eight and six years, and

four daughters, two married and two single, 15 and 17 years of age. The four younger sons and two single daughters lived with their father. The deceased, Mrs. Lizzie Morgan, a widow, and her four children had occupied a part of the old negro seminary building for about two years. The plaintiff in error became infatuated with her, and for a while she permitted his attentions, but finally refused to marry him. On the morning of the tragedy, between 8 and 9 o'clock, the plaintiff in error entered the seminary building, and, seeing Mrs. Morgan, he drew a pistol, saying, "Old gal, your time has come," fired three shots, one of which entered her right side and another her left side, from the effect of which Mrs. Morgan died that day, about 3 o'clock.

Mrs. Renner, a sister of Mrs. Morgan, testified: That she lived with her husband near the seminary spring, and Mrs. Morgan's little girl came screaming and saying that there was something the matter with mamma, and she rushed up to the seminary building, and met Owen coming out with a pistol in his hand. He said: "Stop until I tell you what I have done; I have killed her;" and she said: "For God sake what did you do this for?" He said: "Do not be scared; I would not hurt a hair on your head or Mr. Renner's either. I killed her because she would not marry me. I have not had any peace for two years, and she would not marry me, and I killed her." That she went into the room where her sister was lying on the bed, and Owen followed her in, and said, "Has she got her dose?" and she said, "Yes; she is dying now; for God sake get out of here;" and Mrs. Morgan said, "Good-bye, Abe, and go on away, you have killed me;" and Owen said, "Good-bye; I will meet you in hell where you belong;" and as he started out the door he turned

around and said, "I have two more bullets, and I am going to put them right here;" and Mrs. Morgan said, "O God, have mercy on me and my little children!" and Owen said, "There is no God; there is no mercy for you; go on to hell where you belong;" and with an oath he went out.

The county attorney and the court reporter reached the scene of the tragedy before Mrs. Morgan died, and she made the following statement:

"Abe Owen shot me. He shot me because 1 would not marry him. He said: 'I am going to give you one more chance to be my wife, or I will shoot you.' He said last summer if I would not be his wife he would shoot me. He has been trying to talk to me ever since I have been out here. When I got up this morning I got a threatening letter under the front door. It said: 'I have everything ready and you are a damn hypocrite, and a liar, and fit for hell.' This letter was in his handwriting. I know his handwriting. He winked at me as he came by the window. I smiled and did not get mad. They were all talking, and I thought he was gone. He came in and said: 'I have got everything ready. You are fixed'— and got his gun out and hit me the first shot. He shot three times and hit me twice, and I ran under the table the second shot. Mr. Slape and Mrs. Slape and Della Ryals were in there, and I think they all ran out. It was a big gun. It must have been a 44 Colt's. As he went out the door I said: 'O! Lord, have mercy on me and care for my babies!' He said: 'Don't call your Lord; hell is the place for you.' As he left I reached out my hand and said: 'Good-bye, Mr. Owen.' He came back and said he had come back to see if he had done his work and if he had not he was going to. That is why I said to him what I did."

W. P. Davidson, sheriff, testified that he arrested the defendant about a week later near Fayetteville, Ark.;

that after he ·was placed in ·the county jail at Tahlequah his children visited him, and he told them not to grieve after him; that he was on his way. to hell. There is no dispute as to the facts and circumstances of the homicide.

The theory of the defense was that the defendant was of unsound· mind and wholly irresponsible for his acts.

.J. F. Owen, an older brother, testified that the defendant was born at Rolla, Mo.; that when he was 12 years old the family. moved to Newton county, Ark.; that their mother was a sickly, weakly woman; that sometimes she would just get mad and would not talk to anybody for a day or two; that Dr. Shinn of Yardell, Ark., treated her. On cross-examination he stated that he never knew of any member of the family. on either side ever having any brain trouble or weakness of mind.

, Ella Owen, a daughter of the defendant, testified that two days before the tragedy her father had some kind of spell, and her brother brought him to the house, and they put him to bed; that her father had one or two of these spells a month; that after these spells he did not talk with any sense.

Stella Owen, another daughter, testified that her father had spells sometimes twice a month; that when they came on he would lay down wherever he was, and for two or three days after one of these spells he would not be in his right mind.

. Frank Owen, his son, testified· that his age was twenty-eight years; that two days before the homicide he was working with his father. near the house and his· father had a spell, and he took him by the arm and led him to the house and put him on the bed; that for more than

a year his father had been having these fits or spells, and about 14 years before, when they were living in Arkansas, his father had three or four of these spells, and was attended by Dr. T. J. Shinn, who lived at Yardell; that after these spells his father would be crazy for a day or two and generally would talk on Scriptures or about Socialism.

Arthur Reagan testified that he was the defendant's son-in-law, and lived about three miles from the defendant's place; that on the morning of the homicide, between 6 and 7 o'clock, the defendant called at his house and asked him for his gun and he let him have it; that the defendant said he was going down about Okmulgee; that he seemed to be in his right mind at that time.

As a witness in his own behalf the defendant testified:

"That he had not been in anything like good health for 30 years; that when he was about 20 or 25 years old he had some mental trouble, and corresponded with a doctor at Kansas City, but don't remember his name and don't remember what name he gave to his mental trouble; that he treated him until he could not buy his medicine any longer and got all right; after that was in pretty good health until about 12 years ago, that Dr. T. J. Shinn at Yardell treated him, also a younger Dr. Shinn, who now lives at Wagoner, treated him for the same kind of mental trouble; that he had several light strokes while in jail."

His further examination was, in part, as follows:

"Q. Can you state to the jury whether or not within the last year or year and a half those spells have increased in frequency? A. Yes, sir; and they were harder; they would last longer after the main part of them. After the main part of my spells would quit I would

feel queer and kind of foolish for sometimes a week.
They did not work exactly alike all the time. Q. How
long have you known Mrs. Morgan? A. Well, sir, I think
I have known her from the day she moved into the old
colored seminary in January, 1914, I reckon it was. Q.
What was the purpose of your going to the place where
she lived on the 4th day of May, 1916? A. Well, sir, I
went by there to see one Bill Slape. He lived in the
north end of the old seminary building, and Mrs. Morgan
occupied the three south rooms. Q. What purpose did you
have in view when you went there on May 4th? A. I
went there to see Mr. Slape on a business transaction. Q.
What were your feelings with relation to Mrs. Morgan?
A. I had a tender feeling, a kind feeling towards her; I
respected her as a lady. Q. Did you ever have any trou-
ble with Mrs. Morgan? A. No, sir; none whatever. Q.
I will ask you if you ever proposed to Mrs. Morgan? A.
Yes, sir; that was along in February or March after she
came there in January. Q. Was there any conditions
attached to that agreement? A. Yes, sir. Q. What was
one of the conditions? A. Well, she told me when we
raised the subject we could not possibly get married un-
der two or three years, or possibly four years. Q. Did
you know what family Mrs. Morgan had at that time?
A. Yes, sir; she had three little girls and one little boy.
Q. Where did you get the pistol? A. I got it from Arthur
Reagan, my son-in-law. Q. Do you remember what time
of day it was when you got that pistol from Arthur
Reagan? A. It was early in the morning. Q. What did
you tell Reagan you wanted with the pistol? A. I told
him that I was going to Okmulgee when he let me have
the gun. Q. Did you intend to go to Okmulgee? A. No,
sir; I never had any intention of going there. Q. Where
did you go? A. Well, started back home, and when I
got down near the seminary to where there is a road
running towards home I just decided I would go by the
seminary, by Bill Slape's place, and close up this crop
deal with him if I could. Q. Now, what was your inten-
tion by getting that pistol? A. My intention was to shoot

myself. I aimed to shoot my own head clear off. Q. Why did you decide that? A. Simply because my satisfaction on this earth was destroyed. That is exactly it. That is the truth about it. I was robbed of what I had. Q. How did you enter that house where Mrs. Morgan was? A. I went at the north door. There was a wagon backed up to the door, and they were loading some stuff in the wagon. Ode Nodine and his brother were just starting out with a sewing machine. Q. Now what took place when you went into the room belonging to Mr. Slape; do you remember whom you saw in that room? A. Well, no; I remember Mr. Slape being there, and I remember Mrs. Morgan being there. I didn't know that she was in there until I got in there, but the other parties I can't remember who they were. Q. Where did you have that pistol when you entered the room? A. I had it right here on my left side. Q. Did you say anything to any one in the room? A. I spoke to those boys. As I told you, they was coming out with that sewing machine, and I was just going in, and I swung over to the left, and I was about to fall until they stepped over and gave me room, and I just stepped over to the side of them, and that threw me near to Mrs. Morgan, and when I saw her she turned and looked at me and gave me the hardest look I ever seen, and for some cause I lost control of myself, and I said, 'Old gal, the time has come when you can't put nothing else over me,' and I reached and got this gun and shot and missed her. She never said a word. She just turned around and dropped down under the table. As she went down she put her hand on her bosom, and I just dropped down and shot at her again under the table, and she turned and raised upon the other side of the table, and I turned and shot again, and she said, 'Mr. Owen, don't shoot any more; you have fixed me.' I said, 'If you have got enough I won't shoot any more,' and I put my gun back. Bill Slape took hold of me, and I said, 'Bill, I have nothing against you, but don't bother me.' Mrs. Morgan went out into the hallway, and I went out after her and asked if she wanted me to lay her on

the bed. I said, 'Wouldn't it have suited you better to have carried out your contract with me than to have it this way.' And she said, 'Don't talk to me about it, go on away;' and I went out in the yard and turned around and went back in the house to see Mrs. Morgan again, and found her laying on the bed, and I went in there, and they would not let me talk to her, kept shoving and begging me to leave, and I turned around and left. Q. Where did you go then? A. I started home, and I met one of my little boys, and I asked him where the oldest boy was, and he told me where he was supposed to be, and I went on, and he was not there, and I started on. Q. Well, you didn't go home then? A. No, sir. Q. How long did you stay in that neighborhood? A. Well, I was there three or four days. Q. Where were you? A. Oh, in the woods, and on the road, and around about there first one place and then another. I was back in them hills east of the seminary somewhere. Q. Why didn't you kill yourself? A. Well, sir, I don't know, but I will tell you. When I shot her it changed my plan, and I went looking for this boy to tell him what to do with my children, and I never did find him; I got lost, and I lost this said gun somewhere."

Several character witnesses qualified and testified that the general reputation of the defendant was that of being a peaceable, law-abiding citizen.

In rebuttal, the state introduced two witnesses who testified that they had known the defendant for about 25 years in Arkansas and Oklahoma, and had never known of him having spells of an epileptic nature or any disorder of the mind.

Several medical experts were called as witnesses by the state, and the court sustained the defendant's objections to hypothetical questions embracing the undisputed facts, on the ground that the proof offered was not proper rebuttal.

The transcript of the testimony covers nearly 300 pages, but the foregoing statement is sufficient to present the questions raised by the errors assigned.

The evidence shows that, when the defendant shot Mrs. Morgan, he knew the nature and quality of the act he was doing. He seemed to have a perfect understanding of the nature of the act, and to know when he committed it what the effect of it was with reference to the crime of murder. The defense of irresponsibility, at best, presented a question of fact for the jury, and it was for them to decide whether or not the defendant was legally responsible for his acts, which was the only contested issue. Their conclusion is amply sustained by the evidence.

Error is assigned on the ground that Jurors Robert Young and C. P. Warren were prejudiced. In his motion for a new trial the defendant states:

"That Robert Young, one of the jurors, had formed and expressed an opinion that a penitentiary sentence would be too good for this defendant; that said statement was made before the trial to and in the presence of Herbert Davidson, whose affidavit is hereto attached; that C. P. Warren, one of the jurors, had formed and expressed the opinion that this defendant was guilty of murder, and that if he, the said C. P. Warren, had his way, he would hang or put in the electric chair this defendant; that said statement was made to and in the presence of Charles Alverson, before the trial of the cause, whose affidavit is hereto attached."

Upon the hearing on the motion for a new trial the juror Young testified, and denied making any such statement to Herbert Davidson or any other person, and the record shows that the affiant Davidson, although duly served with a subpoena, did not appear. The juror C.

P. Warren testified that he made no such statement nor
any similar statement to affiant Alverson. From the
examination of affiant Alverson as a witness it appears
that he is an ex-convict, and four or five witnesses duly
qualified and testified that the general reputation of said
Alverson for truth and veracity in the community in
which he resided was bad.

It is a settled rule of this court that the finding of
the trial court upon a question of fact arising upon affi-
davits and evidence adduced on a motion for a new trial
will not be disturbed where the evidence reasonably
tends to support such finding. *Horton v. State,* 10 Okla.
Cr. 294, 136 Pac. 177; *Smith v. State,* 5 Okla. Cr. 282,
114 Pac. 350.

This brings us to the only remaining proposition in
this cause. When the case was called for trial the de-
fendant filed and presented a motion for continuance
based on the absence of material witnesses in his behalf,
without whose evidence it is alleged defendant could not
safely proceed to trial. His affidavit for continuance con-
tained all the formal allegations required by law, and,
among others, the following statements: That Dr. Thos.
Shinn, of Yardell, Ark., was acquainted with defendant
for many years and acted as his physician when he re-
sided in the state of Arkansas, and if present would tes-
tify that defendant's mother was subject to fits of melan-
cholia, and that he treated defendant for a form of epi-
lepsy, known in medicine as psycho-epilepsy, and that
the general effect of such epileptic condition was to
weaken the mind, judgment, reason, and the ability to
differentiate between what is morally right and what is
morally wrong; that Dr. T. J. Shinn, of Wagoner, Okla.,
would testify that defendant was afflicted with said dis-

ease, which is a progressive disease of the mind; that Andrew J. Foster, of Moodys, Okla., was duly served with a subpœna to appear as a witness, but was confined to his bed with fever, and was too sick to attend the trial; that, if present, he would testify that he was with defendant in the fall of 1915, near the town of Hulbert, Okla., when defendant was .attacked by a spell or fit of epilepsy.

. The application for continuance was overruled, exception allowed, and the trial proceeded.

Counsel for the defendant contend that:

"The overruling of the motion for a continuance was a denial of defendant's constitutional right to have compulsory process for witnesses in his behalf, and in contravention of defendant's constitutional guaranties within the meaning of our Bill of Rights."

No rule is more firmly established in this state than that this court will not reverse a judgment of the trial court upon the ground that it refused to grant a continuance unless it appears that such court has manifestly abused its discretion in refusing it. However, it is the right of every person accused of crime to have a fair and impartial trial and compulsory process to compel the attendance of his witnesses, and that involves, as a matter of course, the time reasonably necessary to prepare for trial, and to find and produce testimony in his defense. It is not, however, a matter of which the defendant can complain that the trial is speedy, if he has had time for preparation and is ready for his defense. Continuances ought always to be granted when, from the showing made, justice requires it; this to enable the defendant to procure all legal and competent evidence nec-

essary for the fair presentation of his defense, if he has used due diligence to obtain the same.

Under our Procedure Criminal the defendant has the right to take the deposition of any material witness residing out of the state, and this only when an issue of fact is joined upon an indictment or information. Section 6036, Rev. Laws 1910. The application must be made upon affidavit (section 6038, Rev. Laws 1910), and must be upon five days' notice to the county attorney (section 6039, Rev. Laws 1910). It is further provided that upon a motion for continuance on account of the absence of evidence, if the state will consent that on the trial the facts alleged in the affidavit shall be read and treated as the deposition of the absent witness, no continuance shall be granted on the ground of the absence of such evidence. Section 5045, Rev. Laws 1910.

When a defendant desires the testimony of a witness who is a nonresident of the state, and therefore not amenable to the process of the court, he cannot rely upon such nonresidence of his witness as a cause for a continuance, unless he shows that he desires to take the deposition of such nonresident witness. Here the defendant stated in his affidavit that he desired the presence of the nonresident witness. However, technical objections should not ordinarily prevent the granting of a motion for a continuance, if it is necessary to the proper presentation of the defendant's case. And in this case we think the county attorney should have admitted that the witnesses, if present, would testify as stated in the defendant's affidavit, and that said affidavit might be read and treated as the depositions of the absent witnesses, and, failing to do this, the trial should have been postponed at least ten days.

Counsel for the defendant contend that at least the judgment and sentence should be' modified to imprisonment for life. Under the following provision of our Penal Code the punishment to be inflicted for the crime of murder is left to the determination of the jury:

"Any person convicted of murder shall suffer death, or imprisonment at hard labor in the state penitentiary for life, at the discretion of the jury." (Section 2319, Rev. Laws 1910.)

The verdict of the jury is conclusive upon the trial court, and the' court below is without power or authority to render judgment and sentence except in accordance with the verdict. On appeal, however, our Criminal Procedure Act provides that:

"The appellate court may reverse, affirm or modify the judgment appealed from, and may, if necessary or proper, order a new trial." (Section 6003, Rev. Laws 1910.)

Under the statute this court, in the furtherance of justice, has the power and authority to modify any judgment appealed from by reducing the sentence. However, that power should not be exercised unless it is apparent that injustice has been done. *Fritz v. State*, 8 Okla. Cr. 342, 128 Pac. 170.

In this case we think the defense of insanity entirely failed and was properly discredited by the jury; yet upon the record before us we are unwilling to say that the overruling of the motion for a continuance did not. endanger the rights of the defendant, and without the power given under the statute to modify the judgment this court would be compelled to reverse the case and remand it for a new trial, and for' the reasons stated we think

that the judgment and sentence in this case should be modified to imprisonment for life at hard labor.

The judgment of the district court of Cherokee county herein will be modified to the extent that the sentence will be changed from the infliction of the penalty of death to that of imprisonment in the state penitentiary at hard labor for life, and, as thus modified, the judgment is affirmed.

ARMSTRONG and BRETT, JJ., concur.