## CLAY AGENT v. STATE.

No. A-3358—Opinion Filed June 7, 1920.

Rehearing Denied Jan. 15, 1921.

(194 Pac. 233.)

(Syllabus.)

1.  **INDICTMENT AND INFORMATION—Variance from Complaint.** When it appears that the charge in the complaint before the committing magistrate is substantially the same as that charged in the information, a motion to quash on the ground that the offense charged in the information differs from that charged in the complaint upon which the defendant was held to answer is unavailing, and was properly overruled.

2.  **APPEAL AND ERROR—Presumptions—Basis of Felony Information.** Under the provisions of section 5680, Rev. Laws 1910, the examining magistrate in felony cases is authorized to bind the defendant to answer either the offense named in the preliminary complaint or "any other offense, according to the fact"; and this court will presume, in the absence of an affirmative

showing to the contrary, that the information upon which the case is tried was supported by the facts disclosed by the evidence of the state at the preliminary hearing.  *

3.    **HOMICIDE—Information and Evidence—Variance.** In a charge for murder under the first subdivision of section 2313, Rev. Laws 1910, the information may charge the killing to have been committed with a premeditated design to effect the death of some person other than the one killed, and it would not be a fatal variance to prove at the trial a premeditated design to effect the death of the person killed, and converse of this proposition is also true.

4.    **HOMICIDE—Instructions—Appeal—Necessity for Injury.** Where a defendant is convicted of manslaughter in the first degree, instructions complained of, defining murder, will not be considered on appeal, in the absence of some affirmative showing that the defendant was substantially injured thereby.

5.    **TRIAL—Assistance of Private Counsel in Prosecution.** Where the record shows that the regular county attorney, who signed and presented the information, appeared at the trial and was in charge and control of the prosecution of the case, it is immaterial whether another attorney appeared to assist in such prosecution either in the role of private counsel or as an assistant county attorney.

6.    **TRIAL—Excusing Witness From Rule—Discretion.** It is discretionary with the trial judge to excuse from the operation of a rule separating the witnesses and to permit a member of the bar to remain in the courtroom during the progress of the trial, although such person's name is indorsed on the information as a witness for the state, and he is sworn as such a witness.

7.    **APPEAL AND ERROR—Review—Competency of Jurors.** The issue raised upon a challenge for cause to a juror in a criminal case on the ground that he has formed an opinion founded upon rumor, statements in public journals, or common notoriety, and upon which he has expressed an opinion, is one of mixed law and fact; and the finding of the trial court upon the issue ought not to be set aside by a reviewing court, unless it appears that upon the evidence the trial court ought to have found that the juror had formed such an opinion that he could not in law be deemed impartial.

8.    **HOMICIDE—Self-Defense—Evidence—Threats.** Alleged threats made by a third person against the defendant, and not communicated to the defendant prior to the commission of the homicide, are inadmissible in evidence in a case where the defendant

claims to have killed the deceased in self-defense, mistaking the deceased for such third person, there being no evidence of a conspiracy between such third person and the deceased to kill the defendant or to do him serious bodily harm, or any concert of action between such third person and the deceased at the time of the commission of the homicide, or any other evidence tending to connect such third person with the deceased, or tending to connect the deceased with any alleged uncocmmunicated threats.

9.    CRIMINAL LAW—Test of Criminal Responsibility.  Under section 2094, Rev. Laws 1910, the test of criminal responsibility for committing an act which is declared to be a crime is fixed at the point where the accused has mental capacity to distinguish between right and wrong as applied to the particular act, and to understand the nature and consequences of such act.

10.   HOMICIDE—Self-Defense—Evidence of Defendant's Intoxication.  In a homicide case, where the plea is self-defense, evidence as to whether the accused was intoxicated or under the influence of intoxicating liquors at the time of the homicide is competent for the purpose of aiding the jury to determine whether or not the accused acted under the influence of a well-grounded and reasonable belief that he was in imminent danger of losing his life or receiving great personal injury.

11.   TRIAL—Instructions—Sufficiency as a Whole.  The instructions must be considered as a whole, and where they fairly and fully state the law of the case, and are as favorable to the defendant as the evidence would warrant, they are sufficient.

*Appeal from District Court, Sequoyah County;*
*John H. Pitchford, Judge.*

Clay Agent was convicted of the crime of manslaughter in the first degree, and he appeals.   Affirmed.

This is an appeal from the district court of Sequoyah county, wherein the defendant, Clay Agent, was convicted of the crime of manslaughter in the first degree, and sentenced to serve a term of six years' imprisonment in the state penitentiary, for the killing of one A. B. Watson.

This killing occurred in the city of Sallisaw, on about

the 5th day of May, 1916, at about 8:30 or 9 o'clock in the evening. The killing occurred at the home of Sarah C. Brackett, a neighbor of the defendant, who lived across the street and southwest from the defendant's home. The defendant and deceased were total strangers, and the only excuse the defendant had for killing the deceased was that he mistook him for one Ben Summers, a brother of whom the defendant had previously killed, when the defendant was acting as deputy sheriff of that county, in an effort on the part of the defendant and other officers to quell a riot and to prevent the commission of a felony by the said brother of Summers and others, at the time the defendant was compelled to and did kill the said brother of Ben Summers.

Further, it is contended on the part of the defendant that, after the defendant had killed Summers, Ben Summers made numerous threats to take the life of this defendant, which said threats were communicated to the defendant; and there is considerable evidence in the record to show that the defendant was told of certain alleged threats on the part of Ben Summers against him.

The defendant claims he shot A. B. Watson in his apparent necessary self-defense, under the impression at the time that the said A. B. Watson was Ben Summers, and in this connection, concerning the reasonableness of defendant's belief, the following excerpts from his direct and cross-examination are incorporated in this statement:

"Q. Where did you go from there? A. I went in and lit the lamp, and I saw some parties sitting on the porch at Mrs. Brackett's, and I went over and asked Mrs. Brackett if Mrs. Agent was there. Q. Now what direction does Mrs. Brackett live from your house? A. Mrs.

Brackett lives very nearly southwest across the street; not exactly, but very nearly southwest of where I live. Q. When you saw them sitting over there on the porch and got over there, where was Mrs. Brackett sitting? A. She was sitting on a chair on the north of the door on the porch. Q. Where was Mr. Watson sitting? A. He was sitting in a chair with his back leaning against the post. Q. Where was the post with reference to the door? A. Well, the door—I can explain to you better than I can tell you. Like this was the house (indicating). There is three posts, supports, on the porch, and this post was sitting here about the center I suppose, and he was sitting with his back to this post on the porch. Q. Was he immediately in front of the door or south, or north of the door? A. He was south of the door. Q. What did you do when you walked over there? A. I asked Mrs. Brackett if Mrs. Agent was there. Q. What did she say? A. She said, 'No, she isn't here.' She said, 'Go away from here.' Q. Go ahead and tell what occurred and what was said. A. Well, I asked her if Mrs. Agent was there, and she said, 'No, you go away from here;' and this man turned and said, 'Get away from here; you have no business here;' and I said, 'All right,' I would go away, and I started to retreat, and as I started away this man kind of stood up about in this position (indicating), and throwed his hand back nearly in this position (indicating), and the first impulse of the moment was that it was Ben Summers, and I immediately pulled my gun and fired. I went on across the street. As I went up the street Mrs. Brackett was still at the door; she hadn't gone in the house; and I said, 'Mrs. Brackett, you have been harboring a man to kill me.' Q. When the deceased, Watson, attempted to get up, what was said, if anything, by him? A. He says, 'Get away from here, damn you, or I will get you.' Q. What position was he in, and what position was his hands in, when he made that statement? A. Well, he was in a rising position over something like this (indicating), turning this way (indicating), like he was

turning around. He hadn't got straight up. Q. And you fired? A. Yes, sir. Q. Did you ever at that time say to Mrs. Brackett—call her any vile name of any kind? A. No, sir; none whatever. There was not but the one word spoke that I said. Q. What did you do then? A. I went on across the street on the corner, and back up the street a piece, and stayed there for awhile, and then went up to Mr. Spelse's. Q. What did you do when you got to Spelse's? A. I told Mr. Spelse I had shot Summers, and to call my son. He was police, and I told him to call him, and tell him I was up there, and he come up there and got me. Q. Did you stay there until he come and got you? A. Yes, sir."

Cross-examination: "Q. Now, when you first went up there you say you asked Mrs. Brackett if your wife was there? A. Yes, sir. Q. She said no, and you to get out? A. No. Q. Well, what did she say? A. She said, 'Get away from here.' Q. You remember that, do you? A. Oh, yes. Q. Then you noticed this man sitting there, or had you noticed him before? A. I saw him there when I walked up. Q. He hadn't said anything up to that time, had he? A. No, sir. Q. Did he immediately then say, 'Get away from here; you have got no business here'? A. When she told me to get away, he said, 'You get away from here; you have no business here.' Q. And raised up and put his hand behind him? A. And I told him, 'All right,' I would go away, and as I told you he said, 'Get away from here,' and started to raise up. Q. And you shot? A. Yes, sir. Q. You remember that part of it, do you? A. Yes, sir. Q. What time of night was it, Mr. Agent, when this shot was fired? A. I don't recollect. I don't know. Q. About what time was it? A. I judge it was somewheres about half past eight or nine o'clock. Q. Where did you go immediately after the shooting? A. I went across the street. Q. Where to? A. I went up on the corner. Q. What did you do then? A. I went back up there, out where I could see. Q. Which way did you go from your corner after the shooting?

A. I went back north.  Q. How far did you go north?
A. Over to the next street.  Q. What did you do then?
A. I set down.  Q. Where-abouts?  A. In the weeds there.
Q. How far from the sidewalk?  A. Right at the edge of
the sidewalk.  Q. How high were the weeds? A. I don't
know; about knee high, possibly.  Q. How long did you
stay there before you left?  A. Before I went to Spelse's?
Q. Yes.  A. I judge it was something like about two
o'clock.  Q. You stayed in that place in the weeds— A. I
stayed right there in that one place.  Q. Then you went
to Spelse's?  A. Yes, sir.  Q. And there you were arrested?
A. Well, I don't know, I phoned for my son to come and
get me.  Q. Well, you gave up.  Was there anybody at
Spelse's before that time that you know of?  A. Not that
I know of.  Q. Did you see anybody passing along the
street up towards Spelse's?  A. I seen some people go
by.  Q. Did you see the sheriff or any of the officers go
by?  A. Not to recognize them.  Q. Did you stop on the
street that Spelse lives on in the weeds?  A. No.  Q. Spelse
lived over on the street facing the railroad?  A. Spelse
lived on Cherokee street and I lived on Choctaw.  Q. It
was on Choctaw street that you stopped, was it? A. Yes,
sir.  Q. What kind of a gun did you use, Mr. Agent?  A. It
was a Colt's gun.  Q. What size?  A. Forty-five."

It was the theory of the state that the defendant
shot and killed A. B. Watson in attempting to take the
life of one Sarah C. Brackett, at whose home the killing
took place, because Mrs. Brackett had permitted the wife
of the defendant to stay at her home for three or four
days prior to the killing.  Concerning what occurred at
the time of the killing, Mrs. Brackett testified in part as
follows:

"Q. Who shot him?  A. Clay Agent shot him.  Q.
Now, tell the jury, Mrs. Brackett— A. Clay Agent is
the man that shot him.  Q. Tell the jury, now, just what
happened at the time he was shot.  A. That night?

Q. Yes.    A. Well. he just stepped in front of my door—
Q. Who did? A. Clay Agent.    Mr. Watson was sitting right
inside of the door, and I was sitting back west of Mr.
Watson, and he just stepped in front of my door and
shot him.    I saw him when he shot Mr. Watson without
a word.    There was not a word spoken until he shot him.
Q. What, if anything, was said after that?    A. Mr. Wat-
son jumped up out of his chair, and said, 'Lord have
mercy'—was the only words he ever spoke out so I
could hear him.    Q. What did Agent say, if anything?
A. He said a mighty dirty word to me.    Q. Just tell the
jury in your own way what he said?    A. He called me a
God damned bitch, and said I had been harboring his
wife.    I got up in the door and told him I wasn't no God
damned bitch.    Q. Was that before or after the shot was
fired?    A. It was after the shot.    Q. How long after?
A. Just as soon as he shot he turned and started back,
towards the street, and he said that as he went.    Q. Did
you see him any more that night?    A. No, sir; I never
saw him any more.    Q. Had you seen him before earlier
in the day?    A. Yes, sir; I had saw him before.    Q.
Where was that?    A. Passed along through the yard at
Mr. Hanserd's and I was over there setting on the porch
talking to Mr. Hanserd.    Juror: Talk a little louder.    A. I
am awful weak, and can't talk much louder.    Mr. Mc-
Combs:    Q. About what time did he pass through the
yard at Mr. Hanserd's?    A. It was just getting dark when
he passed through Mr. Hanserd's yard just over east
of me—just across the street from me, when I was over
there.    Q. Was that Mr. Agent you saw there? A. Yes, sir;
it was Mr. Agent.    Q. About what time was that, Mrs.
Brackett?    A. Well, I don't know just exactly what time,
but it was before dark; it was getting dark.    Q. Had
Mrs. Agent been at your house?    A. Yes, sir; she had
been at my house.    She come there on Sunday night, the
last night of April, and asked me if her and two little child-
ren could stay all night, and she stayed at my house until
Thursday night, the 4th night of May, when she went
away at dark, and Eugenia Adair went with her.    Q.

That was the wife of the defendant, Clay Agent? A.
Yes, sir. Q. Do you know why she was over there? A. I
don't know anything, only— Mr. Curtis: We object to
that. It is incompetent, irrelevant, and immaterial. The
Court: The objection is sustained. This witness would
not be permtted to tell anything Mrs. Agent said. Mr.
McCombs: I understand that. Q. In what direction was
Mr. Agent going when you saw him there at Mr. Han-
serd's that afternoon? A. He was going down south to
Louis Patrick's who lived down on the corner, I reckon.
He went that way. Q. Who was Mrs. Patrick— was she
related to the defendant? A. She was Clay Agent's niece.
Q. Had she been to your house during the time Mrs.
Agent was there? A. Yes, sir; she had been there.
Q. When was she there with reference to the time Mrs.
Agent left? A. She come there before Mrs. Agent left.
Q. What day before Mrs. Agent went away? A. The
same day Mrs. Agent went away, on Thursday. Q. Did
she see Mrs. Agent there at your house? A. Yes, sir. She
saw her and talked with her. Q. Can you show the jury,
Mrs. Brackett, about the position that Mr. Watson was
sitting when this shot was fired, in the chair? A. I guess
so. Q. Show them. A. He was setting sort of this way
(indicating) in his chair, with his head down sort of this
way (indicating), and I was setting on back west of him.
Q. Was he facing—? A. His chair was setting facing
the north, but he was sort of turned in his chair a little
when he was shot. He wasn't looking towards the door.
He was looking towards me, talking to me. He didn't see
nobody. He was shot and killed, and didn't know who
killed him. Q. Just show the jury, in your own way, the
position he was sitting in the chair, if you can? A. I
told you he was sitting this way (indicating), with his
head sort of this way (indicating), down. He was leaning
a little, I think, in his chair talking to me, and I was
setting listening to him. Q. Now, where were you rel-
ative to Mr. Watson? A. I was setting right on back
west of Mr. Watson from the door; just west of the door.

Q. Further in the house? A. Yes, sir; I had been set-
ting there all the while pretty near. Well, I first went
out on the porch, but the air was cool, and I took my
chair back in the house. Q. When did Mr. Watson move his
chair in the house? A Just a little while before he was
shot. He had been setting out on the porch, and he got
up and got him a drink of water, and I told him where
to sleep in the other room, and he pulled his chair in
and set down inside of the door. Q. Now, after he was
shot where did he go? A. He got up and went on to
the bed where I told him to sleep in the south room of
the house. Q. What did he do? A. Got down on his knees
by the side of the bed. Q. Was that the position he died
in? A. Yes, sir; he died right there. Q. That was in
Sequoyah county, state of Oklahoma? A. Yes, sir."

The foregoing statement is sufficient for the purpose
of this opinion.

*W. L. Curtis, Frye & Frye,* and *L. C. McNabb,* for
plaintiff in error.

*S. P. Freeling,* Atty. Gen. and *W. C. Hall,* Asst. Atty.
Gen., for the State.

MATSON, J. (after stating the facts as above). It
is first contended that the trial court erred in overruling
defendant's motion to quash the amended information.

The question raised by said motion was, in effect,
that the defendant had not had a preliminary examina-
tion upon the charge as contained in the amended infor-
mation. In support of the motion, there was attached to
said motion to quash certified copies of the preliminary
complaint, and also the transcript of the examining
and committing magistrate. The preliminary complaint
charged the defendant with "unlawfully, willfully, wrong-
fully, and feloniously, and without authority of law, and

with a premeditated design to effect the death of the said
A. B. Watson, shoot and discharge the said firearm, re-
volver, and weapon at, into, and upon the said A. B. Wat-
son, then and there inflicting certain mortal wounds,"
etc., "* * * with the unlawful, wrongful, and felonious in-
tent then and there on the part of him, the said Clay
Agent, to kill and murder the said A. B. Watson."

The amended information, upon which the defendant
was tried, charged the defendant with the murder of
A. B. Watson in the following manner:

That the defendant, Clay Agent, "on or about the 5th
of May, 1916, with a premeditated design to effect the
death of another person, to wit, Sarah C. Brackett, did
unlawfully, purposely, deliberately, feloniously, and of his
deliberate and premeditated malice * * * shoot and dis-
charge the said leaden balls into the body of one A. B.
Watson, thereby inflicting in and upon the body of him,
the said A. B. Watson, mortal wounds, of which mortal
wounds so made and inflicted in and upon the body of him,
the said A. B. Watson, in the manner and form and for
the purpose aforesaid, he, the said A. B. Watson, then
and there instantly died of the mortal wounds aforesaid,
in the county and state aforesaid, as was intended by
the said Clay Agent that the said Sarah C. Brackett
should; and so the said Clay Agent, in the county and
state aforesaid, in the manner and form and by the means
aforesaid, * * * with the premeditated design to effect the
death of another person, to wit, the said Sarah C. Brackett,
him, the said A. B. Watson, then and there did kill and
murder."

Section 2313, Revised Laws 1910, defines homicide to
be murder:

"First. When perpetrated without authority of law

and with a premeditated design to effect the death of the person killed, or of any other human being."

Both the preliminary complaint and the amended information charged the defendant with the crime of murder as defined by the foregoing subdivision of section 2313, Revised Laws 1910.

The only difference between the allegations contained in the preliminary complaint and those contained in the amended information, upon which the trial was had, was that the defendant was charged in the preliminary complaint with having murdered A. B. Watson with a premeditated design to effect the death of A. B. Watson, while in the amended information the defendant was charged with having murdered A. B. Watson with a premeditated design to effect the death of another person, to wit, one Sarah C. Brackett. Both the preliminary complaint and the amended information charged substantially the same offense. The only difference was in the manner of pleading the offense. The same proof or evidence on the part of the state was admissible under the allegations of the amended information that would have been admissible had the amended information been identical in language with the preliminary complaint.

In *Holmes v. State*, 6 Okla. Cr. 541, 119 Pac. 430, this court held:

"Where an indictment or information charges a defendant with murder under the first subdivision of the statute, * * * a conviction can be had, if warranted by the evidence, under and by virtue of the other subdivisions of the statute. Our statute defining murder was intended to simplify the law upon this subject, and make it plain and bring it within the common understanding of the

citizens of the state, and it does not prescribe a rule of pleading, but establishes a guide to the conduct of the trial prescribing the proof requisite to a conviction."

In *Ponoksy v. State*, 8 Okla. Cr. 116, 126 Pac. 451, it is held:

"When it appears that the charge in the complaint before the committing magistrate is substantially the same as that charged in the information, a motion to quash on the ground that the offense charged in the information differs from that charged in the complaint upon which the defendant was held to answer is unavailing, and was properly overruled."

In the body of the opinion, Doyle, J., speaking for the court, said:

"The complaint filed before the examining magistrate charged that on the 25th day of September, 1910, one Ponoksy, 'at and in the above-named county and state, did unlawfully, willfully, and feloniously take, steal, and carry away one pale red heifer, branded N. N. on the right hip, the property of S. L. Maland, with the intent to appropriate the same to his own use, contrary to,' etc. A warrant was issued, and the defendant was arrested and brought before the justice, and the record shows, for his plea thereto, 'he says that he is guilty and waives his right to a preliminary examination', that thereupon the case was continued; that on the next day the preliminary examination was had, and witnesses were sworn and examined, and after hearing their testimony it was ordered that said defendant be held to answer said charge, and that he be admitted to bail in the sum of $1,000.

"It cannot be doubted that the complaint on which the examining magistrate held the defendant to answer to the district court charged not only substantially, but almost in the identical language, the same crime for which the defendant was tried in the district court. The

complaint filed before the justice cannot be said to charge no crime. It fully charges the stealing of a domestic animal. Probably the testimony of witnesses on the preliminary examination had by the state, after the defendant had waived the same and said that he was guilty, showed that the name of the owner was 'S. L. Noland,' instead of 'S. L. Maland,' and that the stolen animal was a cow instead of a heifer. There is no variance between the complaint and the information as to the date of the offense or crime charged. The state is not barred from holding an examination, even though a defendant waives his right thereto. * * *

"We think that it was never contemplated that the information should charge the crime in the same language, or word for word the same, as charged in the original information filed before the examining magistrate. In our opinion the contention of the defendant's counsel is without merit, and the motion to quash the information was properly overruled."

See, also, *Tucker v. State*, 9 Okla. Cr. 587, 132 Pac. 825; *Sayers v. State*, 10 Okla. Cr. 195, 135 Pac. 944.

While the record in this case shows that the defendant waived a preliminary examination, it also shows that the state demanded, and was permitted, at the preliminary trial, to introduce its evidence, and the defendant was not bound over to answer for the crime until after the state's evidence had been introduced against him. The decision of this court in the Ponoksy Case, *supra*, therefore, is peculiarly applicable to the facts in this case.

Under the provisions of section 5680, Revised Laws 1910, the examining magistrate was authorized to bind the defendant to answer either the offense named in the preliminary complaint or "any other offense, according to the fact"; and this court will presume, in the absence of

a contrary showing, that the amended information in this case was supported by the facts disclosed by the evidence of the state at the preliminary hearing.

The conclusion is reached, therefore, that no error was committed by the trial court in overruling the motion to quash the amended information, (1) for the reason that substantially the same offense is charged in the amended information as was charged in the preliminary complaint; (2) the committing magistrate having heard evidence for the state at the preliminary examination, and being authorized to hold the defendant according to the facts disclosed at said examination, it will be presumed, in the absence of a contrary showing, that the facts disclosed at the preliminary examination were sufficient to support the charge contained in the amended information.

What has been said concerning the first assignment of error is applicable to the objection urged against instruction No. 8, given by the trial court, over the objection and exception of counsel for defendant. In instruction No. 8 the court charged that if the shooting was done "without authority of law, and with a premeditated design to effect the death of said deceased, or with such premeditated design to effect the death of Sarah C. Brackett," etc., then the killing would be murder. It is claimed that under such instruction, the jury was told that, if the shot was fired with the premeditated design of committing either one of two separate murders, then they should find the defendant guilty; whereas the defendant was only charged in the information with committing one murder, and could only have been tried for one offense under said information.

Instruction No. 8 is not open to the objections urged against it, for the reason heretofore indicated, that, under the charge contained in the information, it was immaterial whether the killing was perpetrated with the premeditated design to effect the death of Sarah C. Brackett, or with the premeditated design to effect the death of A. B. Watson. In either event, the killing would have been murder, and proof of a design to kill either of such persons was admissible under the allegations of the information.

Instruction No. 9 is claimed to be erroneous "because based upon an assumption that the shot was intended for Sarah C. Brackett, and not for A. B. Watson, while there is no evidence to support any such assumption." The evidence on the part of the state was sufficient to authorize the court in giving instruction No. 9.

Inasmuch as the defendant was convicted of manslaughter in the first degree, and not murder, the instructions complained of defining murder will not be considered on appeal, in the absence of some showing that the defendant was substantially injured thereby. *Byars v. State,* 7 Okla. Cr. 650, 126 Pac. 252; *Morgan v. Terr.,* 16 Okla. 530, 85 Pac. 718.

It is also contended that "the court erred in permitting the name of J. G. McCombs to be enrolled and entered as special assistant county attorney for the prosecution of this cause, there being no authority under the law designating such an officer, or for the appointment of such an officer."

We find no statement or recital in the record to the effect that J. G. McCombs appeared in this case in the

capacity of special assistant county attorney, or that he was ever appointed and took an oath as special assistant county attorney. Before the jury was impaneled counsel for the defendant objected to J. G. McCombs appearing as "special county attorney," which objection was overruled, to which action the defendant excepted. The record shows that Mr. Kyle, the regular county attorney, who signed the information, appeared at the trial, and was in charge of the prosecution; that Mr. McCombs was appearing with the full consent of the county attorney as an assistant in the trial of the cause, with the approval of the county commissioners of the county.

It is immaterial whether Mr. McCombs appeared in the role of private counsel employed to assist in the prosecution, or whether he appeared as an assistant to the county attorney with the approval of the county commissioners, so long as he did not supersede the county attorney in the prosecution of the cause, and so long as the county attorney did not lose control over the case. We find no merit in this assignment.

During the progress of the trial the court permitted Mr. A. E. Montgomery, a former member of the bar of Sequoyah county, whose name was indorsed as a witness in the case, to sit with counsel for the prosecution after the rule had been demanded and other witnesses excluded from the courtroom during the trial.

It was discretionary with the trial court to excuse this witness from the operation of the rule, it being admitted that Mr. Montgomery was a former assistant county attorney of that county, somewhat familiar with the facts in this case, and a member of the bar of this state.

We do not consider it an abuse of the discretionary power of the trial court to permit such a person, although a witness, to be relieved of the operation of the rule.

It is next contended that the court committed error in not sustaining the defendant's challenge for cause to the juror, O. W. White, who served on the jury, after the defendant had exhausted all his peremptory challenges. The particular ground upon which the challenge was based was that the juror, O. W. White, had formed an opinion as to the guilt or innocence of the defendant.

Upon the voir dire examination of this juror, it appeared that whatever opinion he had concerning the guilt or innocence of this defendant was based upon newspaper reports and rumor; and the juror stated, in answer to the court's inquiry, that, notwithstanding such opinion, he could render a fair and impartial verdict under the evidence and instructions of the court, and that he would not be influenced in any particular by what the newspapers reported or what he had theretofore heard. Upon such a statement under oath by the juror, the court overruled the challenge.

In the case of *Smith v. State,* 14 Okla. Cr. 250, 174 Pac. 1107, it is held:

"The trial court's refusal to sustain a challenge to a juror or for cause will not be disturbed by the appellate court, where it appears from the examination of such juror that he had not talked with any one who purported, of his own knowledge, to know the facts of the case, but solely from hearsay and newspaper reports had formed an opinion which he was positive he could disregard, and also unequivocally swore that notwithstanding such opinion, he would and could render an impartial verdict upon the law and the evidence."

In the body of the opinion it is said:

"It is also contended that the court erred in over-ruling the challenge for cause to certain jurors, among whom was one John Mason, who sat as a juror upon the trial, and to whom challenge for cause was urged after all peremptory challenges had been exhausted. The ground of the challenge for cause was for actual bias, which is defined under a second subdivision of section 5858, Rev. Laws 1910, as follows:

"  'For the existence of a state of mind on the part of the juror, in reference to  the case, or to either party, which satisfies the court, in the exercise of a sound discretion, that he cannot try the issue impartially, without prejudice to the substantial rights of the party challenging, and which is known in this chapter as actual bias.'  •

"It is contended that the juror had formed or expressed an opinion upon the cause to be submitted such as would disqualify him under the foregoing provision of law.

"Section 5861, *Id.*, provides:

"  'In a challenge for implied bias, one or more of the causes stated in the second preceding section must be alleged.  In a challenge for actual bias, the cause stated in the second subdivision of the third preceding section must be alleged; but no person shall be disqualified as a juror by reason of having formed or expressed an opinion upon the matter or cause to be submitted to such jury, founded upon rumor, statements in public journals, or common notoriety, provided it appears to the court, upon his declaration, under oath or otherwise, that he can and will, notwithstanding such opinion, act impartially and fairly upon the matters to be submitted to him.  The challenge may be oral, but must be entered upon the minutes of the court.'

"The latter section has been repeatedly construed by

this court. That said section is not in violation of the constitutional guaranty of the right of trial by a fair and impartial jury was held in *Turner v. State,* 4 Okla. Cr. 164, 111 Pac. 988.

"In *Gentry v. State,* 11 Okla. Cr. 355, 146 Pac. 719, this court, speaking through Doyle, P. J., said:

" 'The issue raised upon a challenge for cause to a juror in a criminal case on the ground that he has formed an opinion founded upon rumor, statements in public journals, or common notoriety, and upon which he has expressed an opinion, is one of mixed law and fact; and the finding of the trial court upon the issue ought not to be set aside by a reviewing court, unless it appears that upon the evidence the trial court ought to have found that the juror had formed such an opinion that he could not in law be deemed impartial. *Ex parte Spies,* 123 U. S. 131, 8 Sup. Ct. 22, 31 L. Ed. 80; *Holt v. U. S.,* 218 U. S. 245, 31 Sup. Ct. 2, 54 L. Ed. 1021, 20 Ann. Cas. 1138.'

See, also, *Stone et al. v. State,* 12 Okla. Cr. 313, 155 Pac. 701.

"The juror Mason on his voir dire examination stated that he had formed an opinion of the guilt or innocence of the defendant based solely on newspaper reports and hearsay. He swore that the opinion would yield readily to the evidence, and that he could, notwithstanding such opinion, act fairly and impartially in the case and be guided by the evidence introduced and the law as given by the court. There was nothing to show ill will or hostility on the part of this juror towards the defendant.

"An examination of the record discloses no abuse of discretion on the part of the trial court in overruling the challenge for cause to this juror such as would authorize this court to reverse the judgment."

The record in this case relative to the alleged disqualification of the juror White is, in substance, the same

as that in the Smith Case relative to the juror Mason. No abuse of the trial court's discretion appears in overruling the challenge for cause to the juror.

In this day of the telegraph, telephone, and free delivery of the mails in city, town, and country districts, hardly a person will be found in any community who has neither read nor heard something concerning an alleged killing in that particular locality, and had, from either newspaper reports or hearsay, formed some sort of an impression as to the guilt or innocence of the party accused. If such impression were to be good grounds of challenge for cause to petit jurors in criminal cases, it would be practically impossible to obtain a trial jury in any county where the crime was committed. Hence the Legislature realized the necessity for the provision contained in section 5861, *supra,* that such a juror should not be deemed disqualified "upon his declaration, under oath or otherwise, that he can and will, notwithstanding such opinion, act impartially and fairly upon the matters to be submitted to him."

Next it is contended that the trial court erred in withdrawing from the consideration of the jury, and in excluding certain proffered testimony by witnesses introduced on behalf of defendant of certain alleged threats made by one Ben Summers against the defendant, which said threats had not been by said witnesses communicated to the defendant prior to the date upon which he was alleged to have murdered A. B. Watson.

In this connection it is to be noted that the trial court admitted evidence of alleged threats made by one Ben Summers against the defendant which were com-

municated to the defendant prior to the commission of the alleged homicide.

Counsel for the defendant claim that the exclusion of these uncommunicated threats was prejudicial to the defendant, for the reason that the defendant claims he mistook A. B. Watson for Ben Summers, and it became material to show the frame of mind of Ben Summers toward the defendant so as to enable the jury, if it adopted the theory of the defendant, to say as to whether or not the defendant was too hasty, under the circumstances in anticipating great and immediate bodily harm from and at the hands of the man whom he believed to be Ben Summers.

Counsel for defendant have cited the court to no authority supporting the contention that uncommunicated threats made by a third person are admissible in evidence under the theory of the defense interposed in this case. In reply to this contention, the Assistant Attorney General says:

"The defendant produced four different witnesses, and proved by them that they had heard a man by the name of Ben Summers make threats against defendant because he (defendant) had killed Summers' brother.

"The threats, according to the same witnesses, were never communicated to the defendant until after he had killed this man Watson, for which crime he was on trial. We understand the law to be that under certain conditions it is permissible to prove uncommunicated threats of the deceased towards the defendant in order to show the state of mind of the deceased and to determine as to who was the probable aggressor. But when those uncommunicated threats were made by some person other than the deceased, we are at a loss in trying to speculate

on what theory of the law or by what processes of reasoning could the threats or state of mind of one man towards another be considered as the mental operations of some other man's mind, a stranger in the whole controversy."

The court concurs in the views expressed by the Assistant Attorney General. These uncommunicated threats would have become material had the defendant killed the said Ben Summers, and had interposed to a subsequent charge of that homicide the defense of self-defense, or had there been evidence of a conspiracy between Summers and deceased to kill the defendant or do him serious bodily harm, or concert of action between Summers and deceased at the time of the commission of the homicide; but threats made by Ben Summers cannot be chargeable to A. B. Watson in order to show the frame of mind of said A. B. Watson, or to show that the said A. B. Watson was the likely aggressor in this difficulty, in the absence of such proof. There is not a scintilla of evidence which in any way connects A. B. Watson with Ben Summers. In fact, A. B. Watson was a stranger in the community, and so far as this record discloses, was unknown to Ben Summers. The court's action in excluding this proffered evidence was proper. 21 Cyc. page 896, and authorities cited; Enc. of Ev., vol. 6, page 797.

It is next contended that the court erred in excluding testimony offered by certain doctors pertaining to the defense of alcoholic insanity.

We have carefully examined the record, and find that there was no offer to prove by any of these witnesses that the defendant, at the time of the commission of the homicide, was in such a mental state as to be unable to distinguish between right and wrong as applied to the partic-

ular act, or unable to understand the nature and consequences of such act. In *Alberty v. State,* 10 Okla. Cr. 616, 140 Pac. 1025, 52 L. R. A. (N. S.) 248, this court held, construing section 2094, Revised Laws 1910:

"Under this provision, the test of criminal responsibility for committing an act which is declared to be a crime is fixed at the point where the accused has mental capacity to distinguish between right and wrong, as applied to the particular act, and to understand the nature and consequences of such act."

To the same effect is the holding in each of the following cases: *Smith v. State,* 12 Okla. Cr. 307, 155 Pac. 699; *Owen v. State,* 13 Okla. Cr. 195, 163 Pac. 548.

In view of the fact, therefore, that there was no tender to prove by these witnesses any fact which would tend to excuse the defendant on the ground of insanity, under the provisions of the statutes of this state and the construction placed thereon by the foregoing decisions of this court, we find no prejudicial error to have been committed by the trial court in excluding the evidence proffered by these witnesses.

It follows from what has been said relative to the action of the court in refusing the proffered evidence on what is claimed to be the defense of alcoholic insanity that there was no error committed in refusing to instruct on such a defense.

Certain other instructions given by the trial court, over the objection and exception of defendant's counsel, are complained of. The brief of counsel for the defendant contains not a single citation of authority to support the various contentions that these instructions were er-

roneous. This court is of the opinion that the instructions, considered as a whole, fairly and fully state the law of the case, and are as favorable to the defendant as the evidence would warrant.

It is also contended that "the court erred in permitting the state on cross-examination, over the objection and exception of the defendant, to inquire of the defendant, H. C. Agent, while upon the witness stand, as to the number of drinks he had taken and as to the state of his intoxication at and immediately prior to the commission of the homicide.

In the case of *Stouse et al. v. State,* 6 Okla. Cr. 415, 119 Pac. 271, this court held:

"In a homicide case, where the plea is self-defense, evidence as to whether the accused was intoxicated or under the influence of intoxicating liquors at the time of the homicide is competent for the purpose of aiding the jury to determine whether or not the accused acted under the influence of a well-grounded and reasonable belief that he was in imminent danger of losing his life or receiving great personal injury."

In this case the plea of self-defense was interposed, and it was permissible to permit counsel for the state to cross-examine the defendant on the question of his intoxication at the time of the commission of the homicide, for the reason stated in the Stouse Case.

Other alleged errors are assigned as grounds for reversal. The brief filed in behalf of defendant contains no citation of authority to support the assertion that the court erred in any of its rulings relative to these matters assigned as error. An examination of the record con-

vinces this court that none of these assignments are meritorious, or that the alleged errors, considered singly or collectively, are of such a prejudicial nature to the substantial rights of the defendant as to form any ground or grounds for the reversal of this judgment.

The testimony adduced by the state would justify a conviction of murder. It indicates the killing by the defendant of a total stranger to him in absolute cold blood. The evidence of the defendant himself does not make out a substantial case of self-defense. His pretext for killing A. B. Watson is extremely flimsy. He says he killed Watson because he believed him to be Ben Summers, and because Watson made a motion towards one of his pockets; yet there is nothing in this record to show, so far as the defendant's testimony is concerned, that he would have known Ben Summers had he seen him even in broad daylight, or that he even was acquainted with the general appearance of Ben Summers. The defendant, with equal propriety and justification, could have killed one hundred other total strangers, merely because a motion was made by any of them towards their hip pocket, or some other pocket, whether for the purpose of drawing a gun, a handkerchief, a pocket knife, or what not, on the mere assumption that such stranger might be Ben Summers. It would be a travesty upon justice to say that the defendant was justified, or even excusable, in killing the deceased, A. B. Watson, even under the circumstances as testified to by the defendant himself.

. To justify a killing in self-defense, there must be a reasonable belief on the part of the defendant that he is in danger of losing his life, or receiving great bodily harm

at the hands of the deceased, and such real or apparent danger must be imminent at the time of the killing. Human life is too sacred to be frittered away upon such flimsy pretexts as testified to by the defendant in this case. The evidence discloses that he went to the home of Sarah C. Brackett, an old neighbor lady of his for many years' duration, armed with a loaded 45 Colt's pistol, and after he had partaken of intoxicating liquors. If he was on a mission of peace, there was no apparent reason why he should arm himself upon such an occasion. He was a public peace officer acting in the discharge of his public duties, and his act in carrying a concealed weapon on such an occasion was unlawful and unnecessary. Furthermore, it is unreasonable to believe that the deceased, A. B. Watson, who was a total stranger, made any attack, or even any demonstration to attack, the defendant upon the slight provocation detailed by the defendant.

This court is convinced that, at the time of the commission of this homicide, the defendant was in a state of anger, created by the fact that his wife had left his domicile some four or five days prior thereto, had taken the younger children with her, because the defendant had been drinking, and she had failed to return home. As a neighborly act, Sarah C. Brackett took defendant's wife into her home, and gave her food and shelter for four days, and up until the day preceding the commission of the homicide. On the afternoon just prior to the commission of the homicide, the defendant admits that he told a neighbor woman that he was in a mood "to shoot until the world was level." His acts and conduct immediately preceding the commission of this homicide cannot be consist-

ently reconciled with the theory that he killed the deceased in his necessary self-defense.

Defendant was ably defended in the trial court. The rulings of the trial court were favorable to him on the admission of evidence and the limitations placed upon his cross-examination. That he only received a conviction of manslaughter in the first degree is extremely advantageous to him, the jury undoubtedly taking the very lenient view that in his intoxicated condition he was incapable of forming a premeditated design to kill.

For the reason stated, the judgment of conviction is. affirmed.

DOYLE, P. J., and ARMSTRONG, J., concur.